# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
May 13, 2015 Session

## KATHRYNE B.F. v. MICHAEL DAVID B.

**Direct Appeal from the Circuit Court for Shelby County**
**No. CT-001822-08     Karen R. Williams, Judge**

---

**No. W2014-01863-COA-R3-CV – Filed July 16, 2015**

---

This appeal arises from post-divorce proceedings. When the parties divorced in 2008, Mother was designated primary residential parent of the parties' one-year-old son. Mother later remarried and sought permission to relocate to Australia with the child. Following a hearing in 2011, the trial court denied Mother's request to relocate and changed the designation of primary residential parent to Father. Mother moved to Australia with her new husband. Mother instituted this proceeding in 2013, alleging that a material change in circumstance has occurred and that it is in the child's best interest to live with her in Australia. The trial court considered testimony over the course of four days and eventually dismissed Mother's petition. In a previous appeal, this Court remanded the matter for specific findings of fact and conclusions of law. The trial court subsequently entered a lengthy written order explaining its decision. Mother filed a second notice of appeal. We affirm in part and reverse in part.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in part and Reversed in part**

BRANDON O. GIBSON, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and KENNY ARMSTRONG, J., joined.

Mitzi C. Johnson, Collierville, Tennessee, for the appellant, Kathryne B.F.

David F. Kustoff, Memphis, Tennessee, for the appellee, Michael David B.

## OPINION

### I. FACTS & PROCEDURAL HISTORY

Michael David B. ("Father") and Kathryne B.F. ("Mother") were divorced by decree of the Shelby County Circuit Court in July 2008. The parties had one child,

Caleb, who was born in October 2006. The trial court entered a permanent parenting plan designating Mother the primary residential parent of one-year-old Caleb. Father was to have parenting time with Caleb three days per week but at varying times due to his atypical work schedule. Father is employed as an assistant manager at Walgreen's, and in any given week, he works a combination of different shifts between the hours of 7:30 a.m. and 10:30 p.m.

In January 2011, Father filed a petition opposing Mother's removal of the child from the jurisdiction of the court. According to the petition, Mother was engaged to an Australian and planning to relocate with Caleb to Australia. Father sought an order denying Mother's request to relocate in accordance with Tennessee's parental relocation statute, Tenn. Code Ann. § 36-6-108. Mother filed a response and a counter-petition seeking the entry of a revised parenting plan that would enable her to relocate to Australia with four-year-old Caleb. Mother married her fiancé on March 6, 2011.

The trial court held a hearing on March 24, 2011, and considered the testimony of Father, Mother, Mother's new husband, and Caleb's paternal grandmother. The court issued a letter ruling on May 5, 2011. The court found that since Caleb was born, the parties had enjoyed "a nearly ideal co-parenting relationship that included both sets of grandparents and nearly seamless transition from one home to the other." In fact, the court found that "the child has been raised by his Mother, his Father, his maternal grandparents and his paternal grandparents." The court noted the parties' agreement that Caleb was spending substantially more time with Mother than with Father, within the meaning of the parental relocation statute, but the court observed that "if you segregate out the time spent with grandparents, then the parents are more nearly equal." In any event, the court concluded that moving Caleb to Australia posed a threat of specific and serious harm to the child that outweighed the threat of harm from a change of custody. *See* Tenn. Code Ann. § 36-6-108(d)(1)(B). The court noted that Mother was proposing to move Caleb not just to another part of this state or country but rather to "the other side of the globe," with a significant time zone differential and even opposite seasons. The court found that Mother's proposed move would separate Caleb "from all he has known, from all of his family and extended family except his Mother by almost half the planet." Having found a threat of specific and serious harm to the child, the trial court was required to determine whether to permit relocation based on the best interest of the child. Tenn. Code Ann. § 36-6-108(e). The court found that many of the best interest factors weighed equally in favor of Mother and Father, while others were inapplicable due to Caleb's young age. However, the court found that the factor regarding the importance of continuity in the child's life and the length of time he had lived in a stable, satisfactory environment weighed heavily in Father's favor. The court concluded that placing Caleb with Father was advantageous because it "would permit him to continue to be involved with his Father and both sets of grandparents as he is accustomed to being." "That is to

say," the court explained, "[Caleb] will now be supported by [a] three-legged stool, whereas in the past he had a four-legged stool. Were he to move to Australia, his stool would have but one leg." The court also considered the stability of each parent's family unit and concluded that this factor also weighed in Father's favor because Mother had only recently married her current husband, whom she met on the Internet and dated "face to face" only a few weeks prior to their marriage. The court noted the testimony of Mother's husband that he had little experience with children and was not a "child guy." Considering all of these factors, the trial court concluded that relocating to Australia was not in Caleb's best interest. Accordingly, the court denied Mother's request to relocate Caleb to Australia and designated Father as primary residential parent. The court entered a written order granting Father's petition in opposition to removal on June 8, 2011, nunc pro tunc to the date of the letter ruling, May 5, 2011. The trial court directed the parties to either tender a modified parenting plan reached by consent or submit proposed plans for the court to consider. However, due to disputes regarding various issues, the parties did not reach an agreement regarding a permanent parenting plan for several months.

In the meantime, Mother moved to Australia on June 3, 2011. Caleb spent approximately six weeks with Mother in Australia during June and July 2011. Thereafter, Mother returned to the United States with Caleb and stayed for about eight weeks to aid in his transition. She returned to Australia in September 2011. After Mother's return to Australia, Caleb's paternal grandmother emailed to Mother a summary of "the schedule we follow for Caleb's care." The email stated, in pertinent part:

> Carol [maternal grandmother] picks Caleb up from Michelle [paternal grandmother] Tuesdays at 9:30 am. - Caleb is there overnight Tues., Wed.
>
> Michelle picks Caleb up from Carol Thursdays at 9:30 am. - Caleb is there overnight Thurs., Fri.
>
> Carol picks Caleb up from Michelle Saturdays at 6:00 p.m. - Caleb is there overnight Sat.
>
> Michelle picks Caleb up from Carol Sundays at 1:30 p.m. - Caleb is there overnight Sun., Mon.
>
> [Father] gets Caleb from whichever grandmother has him when he is off; and delivers him back to whichever grandmother is scheduled to keep him when he has to go back to work. For instance, I didn't keep Caleb yesterday (Thursday) because [Father] was off. He brought him to me today (Friday) at noon before he left for a 1:30-11:00 p.m. work shift at Walgreens.

3

Mother thanked the paternal grandmother for the information about Caleb's schedule without objection. Caleb had another extended visit in Australia for approximately six weeks during December 2011 and January 2012.

A modified permanent parenting plan was finally entered on March 1, 2012. The parenting plan provided that Mother would have "several long-term periods of parenting time with the child each calendar year in Australia" and "additional parenting time with the child here in Shelby County, Tennessee, with the dates to be determined by the parties by agreement[.]" Caleb would primarily reside with Mother during the periods when she returned to the United States, but not to exceed six weeks annually. During such periods, "the Father[] and his family" would have weekly parenting time. Mother was not required to pay child support to Father, but she was fully responsible for Caleb's transportation costs for his visits to Australia. The parenting plan stated that Father agreed to provide extra time to Mother in the upcoming year since Caleb was not yet enrolled in "formal" school. It also provided that Caleb's maternal grandparents were entitled to visitation with him during the first and third weekends of each month from Saturday at 6 p.m. until Sunday at 1:30 p.m., pursuant to Tennessee's grandparent visitation statute, Tenn. Code Ann. § 36-6-306. Father was required to "provide for the child's care with either set of grandparents as the primary option." He was also required to notify Mother if he planned to be "absent from the child" for more than three consecutive days.

Caleb spent two months in Australia during the summer of 2012. Upon returning to Memphis, he began kindergarten in August 2012. The week before school began, Father emailed Mother regarding his plans for Caleb during the upcoming school year. Father informed Mother that he planned for Caleb to spend every school night at the paternal grandparents' house in order to "keep him stable and grounded in a routine as much as possible" and avoid "bounc[ing] him between three beds during his schoolweek." Father informed Mother that the maternal grandparents would have time with Caleb "most weekends" from Saturday at 5 p.m. to Sunday at 1:30 p.m. He would also allow Caleb to spend Wednesday afternoons with the maternal grandparents from the time he was released from school until they finished attending church service on Wednesday evenings so that Caleb could participate in the church choir. Mother responded by thanking Father for the information and stating, "I think it's a good idea for him to have the consistency of one bed during the school week while also keeping his connection with my family and the continuation of his longstanding church activities."

Mother returned to the United States for two weeks in October 2012 around Caleb's sixth birthday. During such visits, Mother and Caleb would typically stay at the maternal grandparents' house, and Caleb would visit with Father and the paternal

grandparents from Friday night until Sunday afternoon.

On January 31, 2013, Mother initiated the instant proceeding by filing a petition to modify the March 1, 2012 parenting plan. By that time, Caleb was mid-way through kindergarten. Mother alleged that even though Father was designated as Caleb's primary residential parent, Caleb was primarily residing with his paternal grandparents, and they were actually raising him rather than Father. Mother acknowledged that "it was contemplated that the child would enjoy time with both sets of grandparents," but she claimed that "it certainly was not contemplated by Mother or the Court that the Father would defer his parenting responsibilities to the paternal grandmother and that she would be the primary caregiver of the minor child." Mother therefore claimed that a material change in circumstance existed and that it was in Caleb's best interest to reside with her in Australia. Mother submitted a proposed permanent parenting plan that designated her as primary residential parent and provided Father with "several long-term periods of parenting time" each year in the United States and in Australia. Pursuant to Mother's proposed parenting plan, Caleb would travel to the United States four times per year during breaks from his school in Australia. The plan provided that Caleb would get to spend the night with his grandparents at least one night per week when he was visiting the United States. Father filed a response denying that Caleb was residing with the paternal grandparents and denying that Mother was entitled to relief.

The trial court heard testimony over the course of four days between April and June 2013. Caleb was six and a half years old. Mother had been residing in Canberra, Australia, for about two years.[1] She and her husband resided in a two-bedroom apartment. Mother worked at a university from around 9 a.m. to 5 p.m., Monday through Friday. Because Mother worked five days per week and arrived home as late as 5:30, she acknowledged the possibility that she would enroll Caleb in an after-school program or summer camp if he moved to Australia. Mother testified that Caleb spent a total of about five months visiting her in Australia over the course of the past two years and that he had made friends there. Mother testified that Caleb had also developed a warm relationship with her current husband, Shannon, who had taught Caleb to swim, snow ski, and boogie board.

Mother testified that when Caleb is in the United States, she communicates with him nearly every day via Skype video chat. She testified that their average Skype sessions last about thirty minutes and occur after Caleb gets home from school in the afternoon, which equates to early morning in Australia before Mother leaves for work. She testified that when Caleb is visiting Australia, he also communicates with Father via Skype several times a week depending on his work schedule. Mother suggested that

_____

[1]Mother testified that Canberra is the capital of Australia and a city of about 370,000 residents.

5

Father and Caleb's grandparents could maintain active involvement in Caleb's life even if he moved to Australia by using Skype and sending letters and care packages. During cross-examination, however, Mother identified several unopened letters that were addressed to Caleb in Australia and mailed by his paternal grandmother. Mother testified that she gave the letters to Caleb, and he did not choose to open them, so she placed them in his backpack when he returned to the United States.

Mother testified that she filed the petition to modify because she did not believe that Father was fulfilling his obligations as primary residential parent. She testified that, based on her observation, Father was not spending any more time with Caleb than he did when Father was designated the alternate residential parent prior to Mother's move to Australia. She noted that Caleb had been spending every school night at the home of the paternal grandparents and also spending time with her parents most weekends. Mother claimed that when she stated in her email that Father's plan for school nights was "a good idea," she simply agreed that Caleb needed consistency during the school week, and she was not advocating for him to stay with the grandparents. Mother admitted that Father was a good father but claimed that he failed to make Caleb the priority in his life.

Mother testified that if Caleb was permitted to move to Australia, he would attend a nearby school and have four breaks from school annually – three two-week breaks throughout the year and a six-week break around Christmas. Mother proposed that Caleb spend each of the two-week breaks and half of his Christmas break in the United States. She testified that Father and Caleb's grandparents would be welcome to visit him in Australia as well. Mother conceded that traveling between the United States and Australia is "not easy," but she insisted that it was realistic to expect the grandparents to make the trip. She acknowledged, though, that her parents had never visited her in Australia. She testified that the cost of flights from Canberra "all the way to Memphis" or vice versa was between $1,500 and $1,800. She mentioned the fact that she had spent "thousands of dollars" on plane tickets for herself and for Caleb. If Caleb were permitted to relocate, Mother proposed that Father be responsible for all of Caleb's transportation costs in lieu of paying child support.

Mother claimed that she had been "consistently the most important person" in Caleb's life. She did not foresee any harm to Caleb by moving him to Australia. She described Caleb as resilient and noted that he was an excellent student. However, she acknowledged that some stress indicators were "showing up in his life." For example, he recently had problems with urinary urgency, which a pediatric urologist diagnosed as stress-related.

Mother's husband, Shannon, testified via Skype from Australia. He also worked at a university in Australia. He generally worked weekdays from 8:30 a.m. to 5 p.m.,

with some flexibility. He described his relationship with Caleb as "excellent." Shannon testified that his previous statement about not being a "child guy" was taken out of context, and that he simply meant that he lacked experience with children. He said he was really enjoying "doing the parenting role" with Caleb. Shannon's mother and father also resided in Australia, but the drive to his mother's house was fourteen hours and the drive to his father's house was seven hours. Caleb had visited them once or twice. Like Mother, Shannon believed that Caleb's relationships with Father and his grandparents were "not as important or essential to Caleb's wellbeing as being with his mother." Shannon suggested that he and Mother would also benefit financially if Caleb were permitted to move to Australia because they were currently "spending so much money" on travel expenses. In other words, he believed that the cost of raising Caleb full-time would be less than the amount he was currently spending on travel expenses.

Mother's parents, Caleb's maternal grandparents, also testified. At the time of trial, Caleb was spending time at their home on Wednesday evenings and "usually" overnight on Saturdays. The maternal grandfather testified that before Caleb started school, he spent about three nights per week at their home, on Tuesdays, Wednesdays, and Saturdays. Prior to that schedule, when Mother still lived in the United States, she and Caleb resided with the maternal grandparents for "a number of months" and then moved into a house "two doors down" from the maternal grandparents. Caleb's grandfather acknowledged that Caleb is well adjusted in Memphis and doing well, but he believed that Caleb was most closely bonded to Mother and that he should reside in Australia with her. He testified that he and his wife had not visited Australia to date because they were not financially able to do so. He explained that even though they could stay with Mother and avoid a lodging expense, the cost of flights was simply too expensive.

Mother's mother testified that all of Caleb's grandparents had always been very involved in his life. When Mother was living near the maternal grandparents and employed, the maternal grandmother served as Caleb's primary babysitter. She testified that when Mother moved to Australia, Mother told her that she intended to build a life and network of support in Australia and then come back to the United States and seek to regain custody of Caleb. The maternal grandmother testified that when Mother moved to Australia, she discussed childcare plans with Father and Caleb's paternal grandmother and, with a "collaborative effort," they worked out a schedule where each set of grandparents would care for Caleb on certain days of the week. "If it worked out so that [Father] had time off in his schedule where he could have Caleb overnight," the maternal grandmother would defer to Father. However, the maternal grandmother estimated that she only deferred to Father for *overnight* stays occasionally, "[m]aybe a couple of times a month." Otherwise, before Caleb started kindergarten, she had him overnight on Tuesdays, when he attended a church Mother's Day Out program, Wednesdays, when he

had choir practice, and Saturdays, when he had church the next day. Once Caleb started kindergarten, she began keeping him Wednesday afternoons until Father picked him up from church, in addition to Saturday nights until Sunday after church. The maternal grandmother admitted that Caleb loves both his parents. She said that Caleb "doesn't lack for physical needs" in Memphis and acknowledged that he is enrolled in a very good school. However, she believed that Father did not have the same emotional connection with Caleb that Mother had. The maternal grandmother confirmed that she and her husband had not visited Australia for financial reasons.

Mother's younger sister testified that she traveled with Caleb to Australia in the summer of 2012 and cared for him while Mother and Shannon were at work. She resided in Memphis but also believed that Caleb should reside with Mother in Australia so that Mother could provide consistency for Caleb.

Mother had hired a private investigator to conduct surveillance of Father and the paternal grandmother over the course of eight days. During that time, however, the investigator saw Caleb only three to four times. One of those times, he saw Caleb with Father; the other times he was with the paternal grandmother. The investigator also confirmed the fact that Father was working at Walgreen's.

At the conclusion of Mother's proof, Father moved to dismiss based on the lack of proof of a material change in circumstances. The trial court declined to rule on the motion until it heard Father's proof.

As noted above, Father was employed as an assistant manager at Walgreen's. He testified that he had been employed at Walgreen's for nearly ten years. He testified that he generally works five days a week, and he had already been transferred, by request, to a location with the minimum number of work hours required for his position. He said he basically runs the store location where he is assigned, making personnel decisions and schedules, ordering inventory, and "the whole gamut." He testified that his work schedule varies from week to week and depends on the schedules of other lower managers, warehouse shipments, and other factors. Generally, Father works either an opening shift from roughly 7:30 a.m. to 4 or 5 p.m.; a mid-day shift such as 9 a.m. to 5 p.m.; or a closing shift from about 2 p.m. to 10:30 p.m. His commute to or from work also takes about twenty minutes. He said he typically works the closing shift once a week but sometimes twice a week. Father said he tries to schedule his closing shifts for Saturdays when Caleb is staying with the maternal grandparents. About once every three weeks, Father must arrive at the store around 5:30 a.m. to receive a warehouse shipment.

Father acknowledged the role that both sets of grandparents play in Caleb's life. He noted that Caleb and Mother lived with the maternal grandparents for about a year

after the parties' separation, and even after Mother moved out, she still lived two doors down. He described Caleb's maternal grandmother as "one of the bedrocks" in Caleb's life. Father said that his own mother had recently retired from her job as a school teacher and "made it her primary mission to help with the raising and nurturing of Caleb." He said that both grandmothers used a curriculum to teach and instruct Caleb before he entered kindergarten that greatly benefitted his intellectual development.

Father testified that, after Mother moved to Australia, he set out specific days of the week when each set of grandparents would have Caleb if Father was working, so that the grandparents would not be at the mercy of his changing schedule each week. For example, on Tuesdays, the schedule "defaulted" to the maternal grandparents unless Father was off work. Father testified that aside from his work hours, he was with Caleb. He said, "whichever days I was off, I would have him for the entirety of that day," and in addition, "[i]f it was a day that I was working, if he was at my mother's house I would be over there as soon as I finished work."

When the time came for Caleb to begin kindergarten, Father said he became uncomfortable with Caleb "getting tossed around a little more than I wanted him to be." Father wanted Caleb to have the stability of sleeping in one bed during the school week. However, Father explained that when he was scheduled for a closing shift on a weeknight, he would not get home until after 10 p.m., and he did not want to wake Caleb at that hour and take him home. As a result, Father decided to have Caleb sleep at the paternal grandparents' house on weeknights. He said this decision gave Caleb structure and a routine but did not change anything in terms of his interaction with Father. Father explained that he was still with Caleb for "the waking hours." Father said this arrangement was easier on all parties except himself, as it required him to go to his parents' house six to seven days a week, much more often than he normally would have. Father said "our typical week involves me living out of their house half the time, is what it -- is what it feels like." However, according to Father, the arrangement benefitted the paternal grandparents and Caleb. Father said that Caleb already had his own room at the paternal grandparents' house, which was "part of what he called home."

Father testified that Caleb wakes around 6:15 a.m. and goes to bed at night at 7:30 p.m. Father lives in a condominium "maybe a mile" from the paternal grandparents' home, so it takes him about two minutes to get there. Father said that when he is not at work, he wakes Caleb up "[p]retty much" every single morning and takes him to school at 7:30 a.m. He estimated that he takes Caleb to school about three times a week. When Father must work the opening shift, the paternal grandmother takes Caleb to school. When Caleb gets out of school at 2:10 p.m., Father picks him up if he is not working. If Father is working, the paternal grandmother or grandfather will pick him up. Father testified that many days when he works the late shift and will not be able to see Caleb

9

after school, he has lunch with Caleb at his school or participates in the parent reading program and the parent watch dog program. He said he visited Caleb's school over thirty times during his kindergarten school year and had lunch with him about once a week. According to Father, Caleb's teachers said that he was the most involved father with the class. He attended field trips, plays, holiday programs, and other events. Father testified that he also attends all of Caleb's doctor visits. Caleb did exceptionally well in kindergarten and tested into the school's CLUE program for gifted students. At the end of the school year, Caleb took a literacy test that indicated he was reading beyond a sixth-grade level.

Father testified that Caleb generally has a Skype session with Mother immediately after school, then he and Caleb have a few hours to play games or work on school projects. Caleb also takes violin lessons. After dinner, Father gives Caleb a bath, brushes his teeth, puts in him bed, and says his prayers with him. Father testified that he sometimes falls asleep with Caleb. However, he generally leaves about an hour after Caleb falls asleep. This is Caleb's routine from Sunday to Thursday nights; unless Father is working, he stays at the paternal grandparents' house every night until an hour or so after Caleb falls asleep. On Friday nights, Father and Caleb regularly go to dinner and a local skating rink with some of Caleb's friends and classmates, then Caleb stays overnight at Father's condo. On Saturdays, Father and Caleb generally go for outings either by themselves or with the paternal grandparents.

Even though the permanent parenting plan provided for Saturday night visitation with the maternal grandparents only on alternating weekends, Father said he generally let Caleb stay with the maternal grandparents about three out of four Saturday nights. Father testified that Caleb's maternal grandparents wanted Caleb to attend church services with them on Wednesday nights, so he also agreed for them to pick Caleb up from school on Wednesdays. Father then picks Caleb up from church, takes him to the paternal grandparents' house, and puts him to bed. Father noted that it's just "the two of us" for the routine on Wednesday nights because the paternal grandmother also has church choir practice. Father claimed that he and Caleb are alone together "a lot of times" during the week, as they sometimes go to his condo after school.

Overall, Father claimed that he, his parents, and Mother's parents work together "as a team" like "a well-oiled machine." Father identified his email to Mother prior to his implementation of the modified kindergarten schedule. He said after Mother wrote back stating that she thought it was "a good idea," he never heard any complaint from Mother about the schedule until he was served with the petition to modify months later. Father said he experimented with having Caleb stay at his home for the last few weeks of the school year and said "[i]t is possible." However, he said that the arrangement required someone to stay at his house late until he gets home from working the closing

shift, so it was harder on his "support team."

Father disagreed with Mother's suggestion that she was the most important person in Caleb's life. He acknowledged that Mother talks with Caleb thirty minutes a day via Skype but said that he is the one taking Caleb to do activities, bandaging skinned knees, giving him baths, and putting him to bed at night. He found nothing "remotely true" about her assertion that she was Caleb's emotional bedrock. Father testified that Caleb experienced anxiety issues just prior to Mother's last visit to the United States, having a urinary urgency issue at school and at home. He said a specialist determined it was anxiety-related and prescribed medication, but the problem ended two to three days after Mother returned to Australia.

Father was of the opinion that Mother's proposed parenting plan had many shortcomings. He explained that once travel time is considered, he would only have 55 days of parenting time with Caleb each year. He claimed that, to accomplish her plan, 16 days per year would be spent "in the air carting back and forth" between the United States and Australia. Father also pointed out the travel costs that would be associated with Mother's plan. Using Mother's estimation of $1,500 to $1,800 per ticket, and her proposal of four trips per year, Father calculated that he would incur between $18,000 and $22,000 in flight expenses annually because of the fact that someone must accompany Caleb on the flights.[2] Considering that Father would only get to see Caleb about 55 days, Father testified that he would be required to pay roughly $400 a day to see Caleb.

On July 30, 2013, the trial court entered an order dismissing Mother's petition to modify the parenting plan, finding there had been no material change in circumstance since the previous hearing when the court found that Caleb had been raised by his parents and both sets of grandparents. The trial court denied Father's request for an award of attorney's fees. Mother timely filed a notice of appeal. On appeal to this Court, we concluded that the trial court failed to make findings to specify the facts upon which the court based its determination that there had been no material change in circumstance and also failed to specify the basis for its denial of Father's request for attorney's fees. *Kathryne B.F. v. Michael B*., No. W2013-01757-COA-R3-CV, 2014 WL 992110, at *1 (Tenn. Ct. App. Mar. 13, 2014). Because we were unable to conduct a meaningful review of the trial court's decision, we vacated the order and remanded for the trial court to make specific findings of fact and conclusions of law. *Id.* On August 26, 2014, the trial court entered a detailed order spanning 26 pages and setting forth the basis for its decision on the parenting issues. Mother filed a second notice of appeal.

---

[2]Father testified that Mother wanted Caleb to fly alone, but Father insisted that he be accompanied. As a result, the March 2012 permanent parenting plan required that Caleb be accompanied by a companion on flights.

## II. ISSUES PRESENTED

Mother presents the following issues for review on appeal:

1.  Whether the trial court erred in granting Father's motion to dismiss the petition to modify the parenting plan;

2.  Whether the trial court erred in not modifying the permanent parenting plan; and

3.  Whether Mother should be awarded attorney's fees on appeal.

In his posture as appellee, Father presents the following additional issues:

4.  Whether the trial court erred in denying Father's request for attorney's fees at trial; and

5.  Whether Father should be awarded attorney's fees on appeal.

For the following reasons, we affirm in part and reverse in part.

## III. STANDARD OF REVIEW

"In a non-jury case such as this one, appellate courts review the trial court's factual findings de novo upon the record, accompanied by a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise." *Kelly v. Kelly*, 445 S.W.3d 685, 691-92 (Tenn. 2014) (citing Tenn. R. App. P. 13(d); *Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013)). We review a trial court's determinations on issues of law *de novo* without any presumption of correctness.[3] *Lovlace v. Copley*, 418 S.W.3d 1, 16 (Tenn. 2013).

---

[3] In this case, Father moved for involuntary dismissal pursuant to Rule 41.02 at the close of Mother's proof. However, the trial court held its ruling in abeyance in order to consider Father's proof prior to ruling on the motion. A Rule 41.02(2) motion for involuntary dismissal challenges the sufficiency of the plaintiff's proof and requires the trial judge to "impartially weigh and evaluate the plaintiff's evidence just as it would after all the parties had concluded their cases" and determine "if the plaintiff has failed to make out a prima facie case by a preponderance of the evidence." *Burton v. Warren Farmers Co-op.*, 129 S.W.3d 513, 520-21 (Tenn. Ct. App. 2002). On appeal, this Court uses the familiar standard of Tennessee Rule of Appellate Procedure 13(d) to review the trial court's disposition of the motion "because the trial court has used the same reasoning to dispose of the motion that it would have used to make a final decision at the close of all the evidence." *Id.* In this case, of course, the trial court did wait to make a final decision at the close of all the evidence. In any event, Rule 13(d) is clearly applicable.

Appellate courts afford trial courts "considerable deference" when reviewing issues that hinge on witness credibility because trial courts are able "to observe the demeanor and conduct of witnesses." *Kelly*, 445 S.W.3d at 692. "Because decisions regarding parenting arrangements are factually driven and require careful consideration of numerous factors, trial judges, who have the opportunity to observe the witnesses and make credibility determinations, are better positioned to evaluate the facts than appellate judges." *Id.* (citing *Armbrister*, 414 S.W.3d at 693). "[C]ustody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during . . . proceedings," and we are reluctant to second-guess those decisions on appeal. *Rountree v. Rountree*, 369 S.W.3d 122, 129 (Tenn. Ct. App. 2012). As a result, "trial courts have broad discretion in determining which parent should be the primary residential parent[.]" *In re Shayla H.,* No. M2013-00567-COA-R3-JV, 2014 WL 2601564, at *5 (Tenn. Ct. App. Jun. 9, 2014) (*no perm. app. filed*) (citing *Reinagel v. Reinagel*, 2010 WL 2867129, at *4 (Tenn. Ct. App. July 21, 2010); *Scofield v. Scofield*, 2007 WL 624351, at *2 (Tenn. Ct. App. Feb. 28, 2007)). Thus, "the ultimate question as to who should be the primary residential parent on appeal is whether the trial court abused its discretion in its selection." *Maupin v. Maupin*, 420 S.W.3d 761, 770 (Tenn. Ct. App. 2013) (citing *K.B.J. v. T.J.*, 359 S.W.3d 608, 613, 616-17 (Tenn. Ct. App. 2011)). "A trial court abuses its discretion in establishing a residential parenting schedule 'only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record.'" *Kelly*, 445 S.W.3d at 692 (quoting *Armbrister,* 414 S.W.3d at 693). If "reasonable minds can disagree as to [the] propriety of the decision made," the trial court's ruling will be upheld. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001).

## IV. DISCUSSION

### A. *Mother's Petition for Modification*

A custody decision is considered res judicata as to the facts in existence when the decision was made. *Armbrister*, 414 S.W.3d at 698-99. "Res judicata is a rule of rest, which promotes finality, prevents inconsistent or contradictory judgments, conserves judicial resources, and protects litigants from the cost and vexation of multiple lawsuits." *Id.* at 698 n.15 (internal quotations omitted). Simply put,

> if either party, as often as he chose, could relitigate the question of custody or support upon the same evidence and the same facts, great would be the inconvenience to the litigants, the courts, and the public; and any trial of the issues would be but an idle ceremony, since it would settle nothing.

13

*Id.* at 699 (quoting *Hicks v. Hicks*, 176 S.W.2d 371, 375 (Tenn. Ct. App. 1943)). In order to balance the interests in finality and stability against the practical reality that changes may occur after the initial custody decree which necessitate modification, courts have required a party seeking to modify a custody decision to first prove that a material change in circumstance has occurred since the prior decree. *Id.* (citing *Ellis v. Carucci*, 123 Nev. 145, 161 P.3d 239, 243 (2007) (recognizing that the concept of material change in circumstances derived from the doctrine of res judicata and was intended to prevent litigants dissatisfied with custody decrees from filing immediate, repetitive, serial motions in the hope of achieving a different result, based on essentially the same facts)). Tennessee Code Annotated section 36-6-101(a)(2)(B) provides: [4]

> If the issue before the court is a modification of the court's prior decree pertaining to custody, the petitioner must prove by a preponderance of the evidence a material change in circumstance. A material change of circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstance may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child.

In sum, when assessing a petition to modify a permanent parenting plan, the court must first determine if a material change in circumstance has occurred and then engage in a best interest analysis. *Armbrister,* 414 S.W.3d 685, 697-98. "When presented with a request to modify a parenting arrangement, the existing arrangement is generally favored, based on the premise that children tend to thrive in a stable environment." *Wall v. Wall*, No. W2010-01069-COA-R3CV, 2011 WL 2732269, at *21 (Tenn. Ct. App. July 14, 2011) (citing *Aaby v. Strange*, 924 S.W.2d 623, 627-28 (Tenn. 1996); *Hoalcraft v. Smithson*, 19 S.W.3d 822, 828 (Tenn. Ct. App. 2001)). Accordingly, "there is 'a strong presumption in favor of continuity of placement' of a child." *Id.* (quoting *Aaby*, 924 S.W.2d at 627). "A trial court's determinations of whether a material change in circumstances has occurred and whether modification of a parenting plan serves a child's best interests are factual questions." *Armbrister,* 414 S.W.3d at 692-93 (citing *In re T.C.D.*, 261 S.W.3d 734, 742 (Tenn. Ct. App. 2007)). Appellate courts must presume that a trial court's factual findings on these matters are correct and not overturn them unless the evidence preponderates against the findings. *Id.* at 693.

### 1. Material Change in Circumstance

---

[4]A different standard applies when a litigant seeks modification of a residential parenting schedule but not the designation of primary residential parent. *See* Tenn. Code Ann. § 36-6-101(a)(2)(C). It is "easier to establish that a material change in circumstances has occurred" when a party seeks to modify only the residential parenting schedule. *Armbrister*, 414 S.W.3d at 703.

Mother did not appeal from the trial court's order and March 1, 2012 permanent parenting plan initially naming Father as the child's primary residential parent and denying Mother permission to relocate to Australia with the child. Accordingly, as discussed above, that order and parenting plan became res judicata on the subject of custody and could only be modified on a showing of a material change in circumstance.[5] The March 1, 2012 parenting plan provided that there would be "no regular day-to-day schedule as in the typical Parenting Plan Orders entered in this Court," but generally, Mother would be entitled to several long-term periods of parenting time with the child in Australia and additional parenting time in Shelby County. The plan provided that when Mother was visiting the United States, Caleb would have certain parenting time with Father "and his family" and "be made available to the [Father's] family." Caleb was also scheduled to have overnight visits with the maternal grandparents two Saturday nights per month. Father was required to "provide for the child's care with either set of grandparents as the primary option" and to notify Mother if he planned "to be absent from the child for more than three consecutive days." Solely for "legal purposes," the plan specified that Caleb was "scheduled to reside the majority of the time with [Father]." Six months before this parenting plan was entered, however, Mother received the email from the paternal grandmother containing the schedule they followed for Caleb's care after she moved to Australia, whereby Caleb was scheduled to stay with either set of grandparents on specified nights unless Father was off work.[6]

---

[5]Both parties analyze this case as an ordinary petition to modify, requiring the demonstration of a material change in circumstance and a best interest analysis. Even though changing custody would require Caleb to relocate to Australia, we agree with the parties' implicit conclusion, and that of the trial court, that the parental relocation statute is inapplicable to this particular proceeding. The parental relocation statute speaks in terms of the relocation of a *parent*. *See, e.g.*, Tenn. Code Ann. § 36-6-108(a) ("If a parent who is spending intervals of time with a child desires to relocate outside the state or more than fifty (50) miles from the other parent within the state, the relocating parent shall . . . ."). Because neither parent is proposing to relocate, the parental relocation statute does not apply.

[6]As noted above, the trial court's June 8, 2011 written order denied Mother permission to relocate and designated Father as primary residential parent "subject to a Modified Permanent Parenting Plan." The trial judge directed the parties to either tender to the court a permanent parenting plan devised by consent or proposed parenting plans for consideration. After disputing various issues, the parties finally reached an agreement as to a permanent parenting plan, which was entered March 1, 2012. During the interim, the parties operated under a June 21, 2011 "Order Regarding International Travel," which allowed Mother to take Caleb to Australia for six weeks during the summer of 2011 but also directed the parties to "continue to consult with one another via the internet during this summer vacation to complete a Revised Parenting Plan Order." When determining whether a material change in circumstance has occurred, we measure from the prior *final* order of custody under which the parties are operating. *Broadrick v. Broadrick*, No. M2013-02628-COA-R3-CV, 2015 WL 1947186, at *5 (Tenn. Ct. App. Apr. 29, 2015) (*no perm. app. filed*); *In re Teven A.*, No. M2013-02519-COA-R3-JV, 2014 WL 7419292, at *4 (Tenn. Ct. App. Dec. 29, 2014) (*no perm. app. filed*); *In re M.J.H.*, 196 S.W.3d 731, 742 (Tenn. Ct. App. 2005); *see also* Tenn. Code Ann. § 36-6-404(a) (providing that "[a]ny final decree or decree of modification in an

15

The parties agree that in August 2012, Caleb started kindergarten and began spending the night at his paternal grandparents' house on school nights, meaning, five nights per week. He also spent three out of four Saturday nights with his maternal grandparents, and time on Wednesday evenings, as opposed to only the two Saturday night visits per month provided in the parenting plan. We agree with Mother's contention that this constitutes a material change in circumstance since the entry of the previous parenting plan. "There are no bright-line rules for determining whether the requisite change in circumstances has occurred." *Keisling v. Keisling,* 196 S.W.3d 703, 718 (Tenn. Ct. App. 2005). "[R]elevant considerations include whether the change (1) has occurred after the entry of the last order sought to be modified; (2) could not be reasonably anticipated at the time the last order was entered; and (3) is one that affects the child in a meaningful way." *Id.* (citations omitted).

The trial court found that Mother failed to prove a material change in circumstance "that was not in existence or reasonably foreseeable" at the time of the March 1, 2012 parenting plan. The court found that Caleb misses his Mother since she has moved to Australia and that Mother has established a nice home there, but "[f]or these items, there were no changes from the situation that existed at the 2011 trial or reasonably anticipated once Mother moved to Australia." The trial court also referenced the requirement in the parenting plan that Father use the grandparents as his first option for child care and found that Father was complying with the parenting plan. Even so, however, we respectfully disagree with the trial court's conclusion that a material change in circumstance has not occurred since the entry of the previous parenting plan. Even though the March 1, 2012 parenting plan contemplated that Caleb would spend a substantial amount of time with both sets of grandparents, the changes that actually occurred once Caleb began kindergarten were significant, material, and unanticipated, and they affected Caleb's well-being in a meaningful way.

## 2. Best Interest

Our conclusion that a material change in circumstance has occurred answers only the threshold question in this modification proceeding. "It does not predetermine the outcome of the case." *Armbrister,* 414 S.W.3d at 705. Tennessee Code Annotated section 36-6-106(a) provides that in any proceeding requiring the court to make a custody determination regarding a minor child, "the determination shall be made on the basis of the best interest of the child." The statute directs the courts to "order a custody arrangement that permits both parents to enjoy the maximum participation possible in the

action for absolute divorce . . . involving a minor child shall incorporate a permanent parenting plan[.]") Thus, we deem the June 8, 2011 order as non-final and measure from the date of the March 1, 2012 permanent parenting plan.

16

life of the child consistent with the factors set out in this subsection (a), the location of the residences of the parents, the child's need for stability and all other relevant factors." *Id.* After the trial court stated its finding that no material change in circumstance had occurred, the court recognized that it was unnecessary to address the best interest factors. However, the court went on discuss the best interest factors and state that if the court was required to reweigh the factors, it would find that "they weigh in favor of Father" remaining the primary residential parent. In addition, the trial court made numerous factual findings earlier in its 26-page opinion that are relevant to the best interest factors, which are set forth below:[7]

**(1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;**

The trial court found that Caleb loves both parents and is loved by both parents. It found that Father has a stable relationship with Caleb but that Mother's relationship with Caleb was disrupted by her decision to move to Australia. The trial court acknowledged that Caleb misses Mother but found that "[Mother] alone chose to act on her desire to marry and move to Australia. She separated herself from Caleb and now wants to separate him from the rest of his family with whom he has shared a very close relationship all of his young life."

**(2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best**

---

[7]The trial court's order on remand, entered August 26, 2014, referenced the statutory best interest factors found at Tennessee Code Annotated section 36-6-106(a). The statute was amended to include these particular factors effective July 1, 2014. Prior to the amendment, the applicable statutory factors were found at Tennessee Code Annotated section 36-6-404(b). "Even prior to the amendment, the analysis under the two statutes was 'quite similar.'" *Broadrick*, 2015 WL 1947186, at *4 n.2 (quoting *Armbrister*, 414 S.W.3d at 697) (noting "significant overlap" and "little substantive difference" between the two sections prior to the amendment). The amendment was simply meant to "alleviate inconsistency and confusion" caused by different statutes containing factors pertaining to judicial review of custodial arrangements and the establishment of residential schedules that "differ[ed] slightly in their specifics." *Muhonen v. Muhonen*, No. E2013-02601-COA-R3-CV, 2015 WL 740667, at *11 n.5 (Tenn. Ct. App. Feb. 20, 2015) (*no perm. app. filed*). The issues in this case do not require us to reconcile any differences in the statutes, so we will discuss the factors analyzed by the trial court for clarity. The statutory factors that are not listed in our discussion were either found inapplicable or equally applicable to both parties and did not impact the court's analysis.

**interest of the child. . . . ;**

The trial judge stated in her written order that she had taken notice "of how each parent encouraged or discouraged Caleb's relationship with the other." The court noted that Father allowed Mother additional time with Caleb before she left for Australia and after she made the move in order to help Caleb with the transition. In addition, he permitted Caleb to participate in Skype sessions with Mother every day. The court also noted that Father allowed Caleb to continue spending time with his maternal grandparents, as he had done in the past. It concluded that Father had "gone to great lengths to assure that Mother, and both sets of grandparents, who have been closely involved with Caleb all of his life, are still a big part of his daily life."

On the other hand, the court found that when Caleb is with Mother, "she makes little effort to direct him toward maintaining contact with his Father and grandparents." For example, when Caleb is with Mother in Australia, he does not Skype with Father every day, she does not encourage him to talk to Father if he does not want to do so, and she does not encourage Caleb to open his mail. The court found that this conduct damaged Caleb's bond with the family members who wrote to him.

**(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;**

The court noted that Father had been Caleb's primary residential parent since 2011.

**(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;**

After reviewing photographs of Caleb in Australia, the court concluded that Caleb has been "enjoying a grand adventure on two continents." The court noted that Shannon had become involved with Caleb and taught him to swim and ski, and Mother's marriage to Shannon had been stable for two years. The court noted that when Shannon was asked questions about Caleb's friends in Australia, his school work, and his music lessons, Shannon "seemed to have little information." Still, the court found that its analysis of this factor was somewhat more favorable to Mother than it had been at the time of the relocation trial, when Mother was recently married to someone she had only dated for a few weeks. The court also mentioned that Mother involved Caleb in the Anglican Church in Australia and that they regularly socialize with other church members. In

18

addition, the court considered that Caleb had visited Shannon's mother and father, although they lived several hours away from Mother's home in Australia. Overall, the court found that Caleb's "personal social circle" is smaller in Australia.

With regard to Caleb's interactions in Memphis, the court noted that Caleb's grandparents participate in his day to day life. Although Mother testified that Caleb's relationship with his grandparents could continue if he moved to Australia, the court recognized the testimony of Mother's father that he and his wife are unlikely to visit Australia due to financial constraints. The court found that Mother's expectation that Father and the grandparents could travel to Australia to visit Caleb was "impractical due to finances, age and distance." In addition, the court recognized that Caleb had "substantially less contact" with both sets of grandparents during his visits to Australia, and he received mail in Australia that was never opened. The court concluded that Mother "apparently makes no effort to direct the child to open all of his mail."

As for Caleb's activities in Memphis, the court found that he is excelling and "at the top of his class" in elementary school, participating in the CLUE program for gifted students, and active in the children's choir at the church of the maternal grandparents. The court found that Caleb has a large group of friends in Memphis. The court concluded that Caleb "is well adjusted and flourishing" under the current parenting plan. The trial court found that these considerations had "shifted further in Father['s] favor" since the relocation trial and that Caleb had "deeper ties with the Memphis community." It found that Caleb is "doing splendidly in school and would be harmed by being moved away" from his community, grandparents, and Father.

**(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;**

Regarding this factor, the court noted that Caleb had been in the care of Father since 2011, and he had "spent his entire life visiting regularly with his two sets of grandparents."

**(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules;**

The trial court found that Father works roughly 45 hours per week, in shifts starting as early as 7:30 a.m. and ending as late as 10:30 p.m. The trial court noted that Father had already been transferred to a smaller store to enable him to work better hours than he had in the past.

The trial court acknowledged Mother's assertion that a primary residential parent

should be able to meet all of the child's needs and be with him around the clock. However, the court noted that Mother is now employed Monday through Friday from 9 a.m. to 5 p.m. and "will not be available to take care of Caleb around the clock either." When Mother and Shannon are working, Caleb would be in the care of unrelated persons rather than grandparents.

In addition, the trial court rejected Mother's argument that Father is "not really raising Caleb." The court found that Father testified "without contradiction, that he is with Caleb every day." The court found that Father "provided stability for Caleb" by allowing him to get "a full night of sleep" at the paternal grandparents' house on school nights. The trial court recognized the alternative of Caleb going to sleep in one location and being awakened and moved after Father's late work shift. The court found that under the current schedule:

> Father goes to his mother's home to be with Caleb in the evenings if he is not working, stays with the child, gives him his bath and puts him to bed. He doesn't leave until Caleb is asleep. When Father works an early shift, his mother gets Caleb up, fed and to school. When Father works a late shift, he comes back to his mother's to get Caleb up and take him to school. On other days, Father goes to Caleb's school to have lunch with his son. Yes, this is an inventive pattern but it works for Caleb.

In sum, the trial court concluded that "[w]hether Father parents Caleb in his home or in his Mother's home is a distinction without a difference. He is parenting his child when he is not working." With the exception of one trip to Thailand, the trial court found "no proof" that Father was spending his time away from work with anyone but Caleb. The court found that Father "does not spend time dating or with his friends or doing activities that are inappropriate for his son." The court also noted Father's active involvement with Caleb's school. The trial court found that "Father is involved with the child every day of his life even though Caleb sleeps each school night at his Paternal grandparent's home."

### (15) Any other factors deemed relevant by the court.

The trial court also noted that Father informed Mother about Caleb's weeknight schedule for kindergarten prior to implementing the schedule, and rather than complaining, Mother "replied the next day saying it was good for him to have this schedule" and "indicated approval" for Caleb's unusual schedule.

The trial court acknowledged Mother's testimony that Caleb misses her but found this to be "the natural consequence of her decision to move to Australia." The court also recognized that if it designated Mother as primary residential parent and allowed her to

relocate Caleb to Australia, "it is anticipated that he will miss his Father with whom he has daily contact, as well as his paternal grandparents and his maternal grandparents with whom he has nearly daily contact also." The court concluded that Caleb currently misses one person, Mother, but he has daily Skype contact with her as well as lengthy periods of parenting time in Canberra and in Memphis. However, if Caleb moved to Australia, he would then miss five "people who are significant to him," and he would be unlikely to have the same level of contact with them that he presently enjoys with Mother because they would be unable to travel as Caleb and Mother do. Considering all of the circumstances and relevant best interest factors, the trial court concluded that "Caleb is thriving in Memphis" and determined that "[i]t is in Caleb's best interest to continue his life as it has been over the last two years."

The evidence does not preponderate against the trial court's finding that it is in Caleb's best interest for Father to continue to be designated as primary residential parent rather than moving Caleb to Australia to live with Mother. When determining the best interest of a child, we must consider the concept from the child's perspective rather than the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004). The statute explicitly requires consideration of "the location of the residences of the parents," *see* Tenn. Code Ann. § 36-6-106(a), and the trial court found that Mother was proposing to move Caleb "to the other side of the planet." This would render it extremely difficult, if not impossible, for Father and Caleb's grandparents to visit him. Moreover, the distance becomes more significant considering the trial court's finding that Mother "makes little effort to direct [Caleb] toward maintaining contact with his Father and grandparents." Father, on the other hand, goes to "great lengths" to facilitate Caleb's relationship with Mother and with both sets of grandparents. Considering the fact that Mother does not get home from work until 5:30 p.m., she acknowledged the possibility that she would send Caleb to summer camp or enroll him in an after-school program if he moved to Australia. He currently goes to bed at 7:30 p.m. In Australia, Caleb does not have family members living nearby who would be available to care for him. We believe it particularly significant that Caleb is flourishing under the current parenting plan. His participation in the CLUE program and his literacy testing indicate that the current arrangement is working well for Caleb. He is also involved in his church choir, taking violin lessons, and regularly participating in activities with a group of friends and classmates.

Mother's only real complaint appears to be the extent of participation by Caleb's paternal grandparents. She claims that they are raising Caleb rather than Father. At the outset, we note that Caleb's significant contact with his grandparents is not a new phenomenon. At the close of the 2011 relocation trial, prior to Mother's move, the trial court found that Caleb had "been raised by his Mother, his Father, his maternal grandparents and his paternal grandparents," pursuant to "a nearly ideal co-parenting relationship that included both sets of grandparents and nearly seamless transition from

21

one home to the other." Once Mother chose to remove herself from that equation by moving to Australia, Father and the two sets of grandparents were left to pick up the slack. Although we agree with the trial court's observation that Caleb's current schedule is unusual and inventive, we also agree with its finding that the schedule "works for Caleb."[8] We also agree that Father is in fact parenting Caleb, and he has not abandoned his role as primary residential parent, as Mother alleges.

At trial, Father conceded that Caleb does not live with him "24/7" but added that "[Caleb] sees me almost every time that he's awake when he's not in school or sometimes when he is in school." Again, Father and the paternal grandparents live approximately one mile apart. Father testified that he and Caleb spend time at the paternal grandparents' house six to seven days a week. When he works the opening shift, he spends the afternoon and evening with Caleb and stays at the paternal grandparents' house until after Caleb is asleep. When Father works the mid-day shift, he wakes Caleb and takes Caleb to school, then returns in time to have dinner with him and put him to bed, leaving after Caleb falls asleep. When Father works the closing shift, he wakes Caleb and takes him to school and generally visits him at school for lunch or other activities. Father suggested that it was inappropriate to characterize Caleb's time with Father and his time with the paternal grandparents "as an either/or proposition" because "that would be a fallacy." He claimed that when Caleb is "with" the paternal grandparents, "more often than not, he is with me. In other words, there's significant overlap between the two." He claimed that Caleb was not really spending time with his grandparents as opposed to time with Father because they were generally doing things together as a family. The evidence supports the trial court's finding that Father sees Caleb every day and is parenting Caleb despite the fact that Caleb sleeps at the paternal grandparents' house. The fact that Father sleeps at his condo one mile away does not alter our conclusion as to Caleb's best interest. Father is there to wake Caleb in the mornings and put him to bed at night, except when he is working. He is deeply involved with Caleb's school and attends all of his doctor's appointments. Also, as Father testified at trial, he makes the ultimate decision with regard to Caleb's schedule, not the grandparents. When Father informed Mother of his plan before Caleb entered kindergarten, she did not complain but said she thought it was "a good idea," never

---

[8]"[W]hile virtually all divorced parents must work outside the home, and some parents must work atypical hours, it is not punishment to the parent to consider the effect of [the] work schedule on the child. Rather, it is the court's job to ensure that the everyday quality of the child's life is not sacrificed to meet the parents' needs or desires. Consideration of how 'child-friendly' each parent's schedule must necessarily be part of that determination." *Wall,* 2011 WL 2732269, at *28. However, "the fact that the custodial parent has an atypical work schedule, in and of itself, should not necessitate a change in the designation of primary residential parent, if the other factors do not weigh in favor of such a change." *Id.* at *27. In this case, the evidence does not preponderate against the trial court's finding that it is in Caleb's best interest to remain in the United States with Father in spite of his atypical work schedule and child care arrangement.

indicating any disapproval of the arrangement until she filed her petition to modify months later.

On appeal, Mother argues that the trial court failed to address her superior parental rights as a parent and therefore violated her constitutional rights. She acknowledges that the parties to this action are both biological parents but claims that this case nevertheless has "a factor of superior parental rights to it." "In custody disputes between parents and non-parents, the comparative fitness analysis cannot be used because it fails to take into account that the custody claims of biological parents and the custody claims of third parties do not have the same legal weight." *In re B.C.W.*, No. M2007-00168-COA-R3-JV, 2008 WL 450616, at *2 (Tenn. Ct. App. Feb. 19, 2008) (citing *Ray v. Ray*, 83 S.W.3d 726, 731 (Tenn. Ct. App. 2001)). When faced with "a contest between a parent and a non-parent," the parent cannot be deprived of custody of his or her child "unless there has been a finding, after notice required by due process, of substantial harm to the child." *Blair v. Badenhope*, 77 S.W.3d 137, 142 (Tenn. 2002) (citation omitted).[9] "Only then may a court engage in a general 'best interest of the child' evaluation in making a determination of custody." *Id.* Clearly, "the standard applied to custody disputes between parents and non-parents [] is very different from the standard applied to disputes involving two parents." *In re R.D.H.*, No. M2006-00837-COA-R3-JV, 2007 WL 2403352, at *6 (Tenn. Ct. App. Aug. 22, 2007). This case, however, involves a contest between Mother and Father, and Father was awarded custody of Caleb. This case does not involve a custody contest between a parent and a non-parent. Therefore, the superior parental rights doctrine is inapplicable.

Mother also argues that Father fails to meet the definition of a "primary residential parent" under Tennessee law. She notes that Tennessee Code Annotated section 36-6-402 provides, "As used in this part, unless the context requires otherwise," a "[p]rimary residential parent means the parent with whom the child resides more than fifty percent (50%) of the time." Tenn. Code Ann. § 36-6-402(4). A "[p]ermanent parenting plan" is described as "a written plan for the parenting and best interests of the child, including the allocation of parenting responsibilities and the establishment of a residential schedule[.]" Tenn. Code Ann. § 36-6-402(3). The statute defines a "[r]esidential schedule" as "the schedule of when the child is in each parent's physical care" and provides that a residential schedule "shall designate in which parent's home each minor child shall reside on given days of the year, including provisions for holidays, birthdays of family members, vacations, and other special occasions, consistent with the criteria of this part." Tenn. Code Ann. § 36-6-402(5). We acknowledge that Father's current arrangement for Caleb does not fit neatly within the parameters of these definitions. However, neither did

---

[9]In this case, the trial court did find that Caleb would be "harmed" by moving his primary residence to Australia. However, the court did not make a finding of substantial harm to the child as would be required under the superior parental rights doctrine.

the March 1, 2012 parenting plan entered following the relocation trial. In fact, the permanent parenting plan stated, "Due to the fact the Mother and Step-Father currently reside in Australia, there shall be no regular day-to-day schedule as in the typical Parenting Plan Orders entered in this Court." Notably, the statute also provides the following definition of "[p]arenting responsibilities":

> (2) "Parenting responsibilities" means those aspects of the parent-child relationship in which the parent makes decisions and performs duties necessary for the care and growth of the child. "Parenting responsibilities," the establishment of which is the objective of a permanent parenting plan, include:
>
>> (A) Providing for the child's emotional care and stability, including maintaining a loving, stable, consistent, and nurturing relationship with the child and supervising the child to encourage and protect emotional, intellectual, moral, and spiritual development;
>>
>> (B) Providing for the child's physical care, including attending to the daily needs of the child, such as feeding, clothing, physical care, and grooming, supervision, health care, and day care, and engaging in other activities that are appropriate to the developmental level of the child and that are within the social and economic circumstances of the particular family;
>>
>> (C) Providing encouragement and protection of the child's intellectual and moral development, including attending to adequate education for the child, including remedial or other education essential to the best interests of the child;
>>
>> (D) Assisting the child in developing and maintaining appropriate interpersonal relationships;
>>
>> (E) Exercising appropriate judgment regarding the child's welfare, consistent with the child's developmental level and the family's social and economic circumstances; and
>>
>> (F) Providing any financial security and support of the child in addition to child support obligations[.]

Tenn. Code Ann. § 36-6-402. Even though Caleb sleeps at the home of the paternal grandparents on school nights, Father is fulfilling all of the aforementioned parenting responsibilities. Our consideration of the aforementioned definitions does not alter the outcome in this case.

24

After reviewing the trial court's thorough and clearly articulated findings, we find no evidence that the court applied an incorrect legal standard, reached an illogical conclusion, or based its decision on a clearly erroneous assessment of the evidence. *See Kelly*, 445 S.W.3d at 696. "Appellate courts should reverse custody decisions 'only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence.'" *Id.* (quoting *Armbrister*, 414 S.W.3d at 693). Here, the trial court applied the proper legal standards, and its custody ruling falls well within the spectrum of possible reasonable results. Affording the trial court the deference it deserves in ascribing credibility and weight to the witnesses' testimony, *see id.*, we find no basis to overturn the trial court's designation of Father as Caleb's primary residential parent.

### B. Attorney's Fees

Finally, Father argues that the trial court erred by declining to award him the attorney's fees he incurred in connection with defending against the petition to modify. Both Mother and Father request an award of attorney's fees incurred on appeal. In the previous appeal of this matter, we considered Father's argument that the trial court erred in denying his request for attorney's fees but stated:

> In its order [of] June 8, 2011, the trial court simply states that Father's request for attorney's fees is denied, and provides no explanation for its decision. Again, the lack of explanation in the court's order stymies our ability to review the court's decision for an abuse of discretion. Accordingly, we vacate that portion of the order denying Father's attorney's fees and remand for specific findings concerning the trial court's reasons for the denial of Father's request.

*Kathryne B.F.*, 2014 WL 992110, at *8. On remand, the trial court entered a lengthy order providing the reasons for its decisions on the parenting issues, but the order failed to address the issue of attorney's fees. The order simply stated that "all motions and petitions heretofore filed, but not specifically addressed, are denied."

Apparently, neither party directed the trial court's attention to the issue of attorney's fees on remand. After the trial court entered its order on remand with no mention of the issue, either party could have filed a post-trial motion noting the trial court's omission in order to avoid the potential for an additional remand and prolonged litigation. *See In re Noah J.*, No. W2014-01778-COA-R3-JV, 2015 WL 1332665, at *5 n.5 (Tenn. Ct. App. Mar. 23, 2015) (*no perm. app. filed*) ("In order to save time and money, parties who receive an order that fails to comply with Rule 52.01 have the option

of seeking correction of that deficiency in the trial court by filing a motion under Rule 52.02 'to amend or make additional findings of fact, whether or not an alteration of the judgment would be required if the motion is granted.'") (quoting Tenn. R. Civ. P. 59.01). As it is, we are left with a bare denial of Father's request for attorney's fees with no explanation of the trial court's reasoning in either of its written orders. Nevertheless, in the interest of justice and economy, in order to avoid a second remand, before a different trial judge,[10] we have reviewed the original trial judge's oral remarks and the entire record in order to address the issue of attorney's fees. At the conclusion of the original hearing on the petition to modify, after the trial judge announced her decision to dismiss Mother's petition, Father's counsel pointed out his prayer for attorney's fees and asked if the trial court would permit him to file an affidavit of attorney's fees at a later date and set the matter for hearing. The trial judge simply responded, "I don't believe I would award attorney fees this time." She added, however, that she would be "more inclined" to award attorney's fees in the future if Mother continued to file repeated petitions to modify with "as little proof" as she presented in support of this petition.

> Tennessee Code Annotated section 36-5-103(c) provides:
> (c) The plaintiff spouse may recover from the defendant spouse, and the spouse or other person to whom the custody of the child, or children, is awarded may recover from the other spouse reasonable attorney fees incurred in enforcing any decree for alimony and/or child support, or in regard to any suit or action concerning the adjudication of the custody or the change of custody of any child, or children, of the parties, both upon the original divorce hearing and at any subsequent hearing, which fees may be fixed and allowed by the court, before whom such action or proceeding is pending, in the discretion of such court.

"'[I]n cases involving the custody and support of children, . . . it has long been the rule in this State that counsel fees incurred on behalf of minors may be recovered when shown to be reasonable and appropriate.'" *Taylor v. Fezell*, 158 S.W.3d 352, 360 (Tenn. 2005) (quoting *Deas v. Deas*, 774 S.W.2d 167, 169 (Tenn. 1989)). There is no absolute right to such fees, but "'their award in custody and support proceedings is familiar and almost commonplace.'" *Id.* (quoting *Deas*, 774 S.W.2d at 170). The allowance of attorney's fees "is for the benefit of the child, and the custodial spouse should not have to bear the expense incurred on the child's behalf." *Huntley v. Huntley*, 61 S.W.3d 329, 341 (Tenn. Ct. App. 2001) (citing *Ragan v. Ragan*, 858 S.W.2d 332, 334 (Tenn. Ct. App. 1993)); *see also Sherrod v. Wix*, 849 S.W.2d 780, 785 (Tenn. Ct. App. 1992) (explaining that the purpose of these awards is to protect the child's legal remedies, not the custodial parent's). "Accordingly, requiring parents who precipitate custody or support

---

[10]We take judicial notice of the fact that the original trial judge has retired.

proceedings to underwrite the costs if their claims are ultimately found to be unwarranted is appropriate as a matter of policy." *Sherrod*, 849 S.W.2d at 785.

In the case at bar, in making its decision regarding attorney's fees, the trial court did not comply with our previous mandate and did not explain the required legal standard or what reasoning it employed. The trial judge's oral remarks indicate only that she was not inclined to award attorney's fees "this time." However, the Tennessee Supreme Court has stated that "'[d]iscretionary choices are not left to a court's inclination, but to its judgment; and its judgment is to be guided by sound legal principles.'" *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007) (quoting Martha S. Davis, *Standards of Review: Judicial Review of Discretionary Decisionmaking*, 2 J. App. Prac. & Process 47, 58 (2000)). Thus, an abuse of discretion will be found "when the trial court . . . fails to properly consider the factors on that issue given by the higher courts to guide the discretionary determination." *Id.*; *see also Gonsewski*, 350 S.W.3d at 105 ("An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard[.]").

Having reviewed the entire record, however, we likewise conclude that Father should not be awarded his attorney's fees at the trial level. We recognize that Mother filed her petition to modify within a year of the entry of the March 1, 2012 permanent parenting plan entered as a result of the relocation trial. We also note that Mother does not pay child support for the child to assist Father with the cost of raising him. However, Father does not cite to any information in the record regarding his ability to pay attorney's fees, and we are not aware of any. The "ability to pay should not be the controlling consideration with regard to awards for legal expenses in custody or support proceedings," but it "is certainly a factor to be considered." *Sherrod*, 849 S.W.2d at 785. Courts may award attorney's fees without proof that the requesting party is unable to pay them as long as the award is just and equitable under the facts of the case. *Id.* Although Mother did not prevail at the trial court level, her allegations were not totally unwarranted, as we have determined that she did successfully demonstrate a material change in circumstances. The record contains no information regarding the amount of attorney's fees incurred by either party. Considering all of the circumstances in this case and the scarce financial evidence pertaining to the issue of attorney's fees, we conclude that it is just and equitable to require both parties to pay the attorney's fees they incurred at the trial level.

As noted above, both parties seek an award of attorney's fees on appeal. Tennessee Code Annotated section 36-5-103(c) also applies to awards of attorney's fees incurred on appeal and vests in this Court the discretionary authority to award fees and costs in proper cases. *Pippin v. Pippin*, 277 S.W.3d 398, 407 (Tenn. Ct. App. 2008). A party who does not prevail on appeal with regard to the parenting arrangement at issue

will not be awarded fees on appeal. *Miller v. Miller*, 336 S.W.3d 578, 586-87 Tenn. Ct. App. 2010) (citing *Smith v. Smith*, 984 S.W.2d 606, 610 (Tenn. Ct. App. 1997)). Consequently, Mother's request for attorney's fees on appeal is denied. As for Father's request, we note that he was, overall, successful in defending against Mother's petition to modify. However, we found merit in one issue raised by Mother -- regarding the existence of a material change in circumstance. Again, we have no information in the record regarding Father's ability or inability to pay his attorney's fees. Exercising our discretion in this case, we respectfully deny Father's request for attorney's fees on appeal.

## V. CONCLUSION

For the aforementioned reasons, the decision of the circuit court is hereby affirmed in part and reversed in part. Costs of this appeal are taxed to the appellant, Kathryne B.F., and her surety, for which execution may issue if necessary.

_____
BRANDON O. GIBSON, JUDGE