IN THE SUPREME COURT OF TENNESSEE
AT KNOXVILLE
May 6, 2014 Session

**TERRI ANN KELLY v. WILLARD REED KELLY**

**Appeal by Permission from the Court of Appeals, Eastern Section**
**Circuit Court for Hamilton County**
**No. 11-D-2052     Jacqueline S. Bolton, Judge**

_____

**No. E2012-02219-SC-R11-CV - Filed September 10, 2014**

_____

This appeal involves the standard that appellate courts should use to review a trial court's decision regarding the credibility of a witness who testifies by telephone. A mother of two children filed for divorce in the Circuit Court for Hamilton County. When the suit was filed, the parties' daughter was living with her mother, and the parties' son was living in Middle Tennessee with his father. Both parents sought custody of their son. When the case was tried, the mother's first witness testified by telephone without objection from the father. The trial court designated the mother as the primary residential parent for both children, and the father appealed. The Court of Appeals declined to defer to the trial court's decision to accredit the testimony of the witness who testified by telephone, and a majority of the panel then reversed the trial court's custody ruling. *Kelly v. Kelly*, No. E2012-02219-COA-R3-CV, 2013 WL 4007832 (Tenn. Ct. App. Aug. 6, 2013). We find that the testimony of a witness who testified by telephone should be reviewed using the same deferential standard as a live witness. Accordingly, we reinstate the trial court's custody decision.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Reversed**

WILLIAM C. KOCH, JR., J., delivered the opinion of the Court, in which GARY R. WADE, C.J., JANICE M. HOLDER, CORNELIA A. CLARK, and SHARON G. LEE, JJ., joined.

Jennifer H. Lawrence and David H. Lawrence, Chattanooga, Tennessee, for the appellant, Terri Ann Kelly.

Richard A. Schulman and McKinley S. Lundy, Jr., Chattanooga, Tennessee, for the appellee, Willard Reed Kelly.

# OPINION

## I.

Willard Reed Kelly and Terri Ann Kelly were married in 1992 in Hamilton County, Tennessee. Their son, W.K., was born in 1997, and their daughter was born in 1999. Mr. Kelly works in the financial industry. Following the birth of the children, the family lived in Knoxville, Nashville, Charlotte, North Carolina, and Richmond, Virginia. Each move was precipitated by a promotion in Mr. Kelly's employment.

When Mr. Kelly accepted the job in Richmond in September 2009, he left his wife and children in Charlotte so they could finish the school year and prepare to sell their house. During this period, the Kellys' marriage deteriorated. Ms. Kelly discovered that Mr. Kelly was having an inappropriate relationship with a female co-worker. Mr. Kelly admitted to the inappropriate relationship, and Ms. Kelly moved the family to Richmond. But the Kellys were unable to salvage their marriage. In April 2011, Ms. Kelly asked Mr. Kelly to move out. He complied, and she filed for divorce in Virginia.

Ms. Kelly then decided to move with the children back to her hometown of Chattanooga to be closer to her parents and other relatives. Mr. Kelly was aware of Ms. Kelly's plans. In July 2011, Ms. Kelly's father traveled to Richmond to help her pack for the move to Chattanooga. During this time, Mr. Kelly took the children on their customary, week-long vacation to a beach house.

When Mr. Kelly and the children returned from vacation, he dropped off W.K. at a friend's house to spend the night and then proceeded home. When he arrived, Mr. Kelly became upset when he learned that Ms. Kelly was planning to move to Chattanooga with the children the next day. Mr. Kelly retrieved W.K. from his friend's house and refused to permit Ms. Kelly to see him. Accordingly, Ms. Kelly and the couple's daughter moved to Chattanooga, and W.K. remained with Mr. Kelly in Richmond.

A short time later, Mr. Kelly lost his job in Richmond. He moved with W.K. to Brentwood, Tennessee and W.K. was enrolled in Brentwood High School. On October 25, 2011, Ms. Kelly filed a petition for divorce in the Circuit Court for Hamilton County because neither she nor Mr. Kelly were residing in Virginia. In this litigation, Mr. Kelly has not taken issue with the couple's daughter residing with Ms. Kelly. However, both he and Ms. Kelly sought to be designated as W.K.'s primary residential parent.

Prior to the divorce, Ms. Kelly did not work outside the home and served as the primary caretaker of both children. Mr. Kelly's income supported the family's lavish

lifestyle. However, Mr. Kelly's income decreased drastically after he lost his job in Richmond. By the time of the trial, he was significantly in debt.

The case was tried on July 12 and 13, 2012. At that time, W.K. was fifteen years old, and his sister was thirteen. In its July 27, 2012 order, the trial court divided the marital property, assigned alimony, and designated Ms. Kelly as primary residential parent for both children. In a September 26, 2012 order, the trial court adopted Ms. Kelly's proposed parenting plan.

Mr. Kelly appealed. A divided panel of the Court of Appeals reversed the trial court's decision to designate Ms. Kelly as W.K.'s primary residential parent and modified the trial court's allocation of property and the award of alimony. *Kelly v. Kelly*, No. E2012-02219-COA-R3-CV, 2013 WL 4007832 (Tenn. Ct. App. Aug. 6, 2013). Ms. Kelly filed an application for permission to appeal, asking that she be reinstated as W.K.'s primary residential parent. In the remainder of this section, we will (1) describe the relevant testimony at the trial court hearings, (2) reproduce the relevant portion of the trial court's order, and (3) describe the reasoning behind the intermediate appellate court's decision to reverse.

**A.**

Ms. Kelly's first witness at trial was W.K.'s guidance counselor at Brentwood High School. She testified by telephone without objection, and her testimony was transcribed by a court reporter during the hearing. Her testimony lasted only several minutes, but we will focus on this testimony because it has become a point of contention between the parties.

The guidance counselor stated that W.K. had attracted her attention even though there were approximately 380 ninth-grade students at Brentwood High School. She testified that W.K. has started gravitating toward a group of students with a reputation for bullying and academic disengagement. She also testified that W.K.'s teachers were concerned that he was failing to do homework, to study for tests, and to make other academic efforts. During his cross-examination of the guidance counselor, Mr. Kelly's attorney referred to a conversation he had with her the night before the hearing and questioned her about something she had told him:

> Q:     Okay. You also made the comment, and you were very
>         candid about this, that you're a proponent of kids being
>         with their mother. Did you not make that comment to me
>         last night?

A:      Yes, I did.  I am a proponent of kids being with their mom and their siblings.

Q:      Okay.  Instead of with their father?

A:      In most cases I think being with mom and siblings; again, what I've seen in the past, seems to be most beneficial. Now, there are always . . . cases where that's not true, but . . . I can only speak to the majority of what . . . I observed.

Both Mr. Kelly and Ms. Kelly testified during the trial.  So did Ms. Kelly's father and a youth minister who worked with W.K. as part of the "Young Life" high school ministry in Brentwood.  W.K. testified in chambers.  The evidence established that, although W.K. wished to remain with his father and hoped to continue attending Brentwood High School, the school had disciplined W.K. for setting off a stink bomb and for sending a sexually inappropriate internet message that embarrassed other students.  W.K.'s grades were also poor.  Ms. Kelly argued that Mr. Kelly and W.K. lived in a "man cave," and that the two had a buddy-buddy relationship that lacked appropriate parental discipline.  Other evidence reflected that Mr. Kelly had communicated with the guidance counselor concerning his son's behavior and grades.  Mr. Kelly also offered his home every other week to host events sponsored by the Young Life youth ministry.

**B.**

We now reproduce, in its entirety, the portion of the trial court's order that concerns the assignment of W.K.'s primary residential parent:

PRIMARY RESIDENTIAL PARENT

As to the most important issue before the Court, that involves [W.K.].  Though it is apparently conceded that [the daughter] will remain with the Mother as her primary residential parent, the issue of [W.K.] is unsettled. Pursuant to [Tenn. Code Ann.] §  36-6-106 et seq., the Court has listened to the reasonable preference of [W.K.] in determining this issue. The Court must make this determination of custody on the basis of the best interest of the child.  The Court has considered the following relevant factors: 1. The love, affection and emotional ties existing between the parents and the child; 2. The

-4-

disposition of the parties to provide for the child with food, clothing, medical care, education, other necessary care, the degree to which a parent has been the primary caregiver; 3. The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; 4. The home, school and community record of the child; 5. The reasonable preference of the child; 6. Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each parent to facilitate and encourage a close and continuing parent child relationship between the child and both of the parents consistent with the best interest of the child.

Perhaps the last factor is one of the most important in this case. The Court is very concerned that upon learning that his Wife was to take the children and return back to Chattanooga with them, following several years of marital upheaval, it was Father's position that the Mother had blind-sided him with the divorce. He swept in to keep [W.K.] in Richmond. The Court finds that the Father has not been as attentive as he should have been to make sure in this transitional year for [W.K.] that he did his homework and studied. The Court finds that the Father did not put his son's best interest first, in that he was more of a buddy to his son than a Father. He did not make the hard choices to disallow [W.K.] from social activities when his grades [were] not good. He did not apparently take seriously the "pranks" which the school deemed "severe." [W.K.] was not further disciplined by his Father other than what the school did for inappropriate behavior. Father lacked judgment in some of his responses to his son. The Court finds that the Father lacks the parenting skills necessary to understand the delicate state of a 15 year old boy whose parents have gone through a very difficult time, as well as the entire family.

The Court further finds it is in the best interest of [W.K.] that he remain in the same home with his sibling, . . . who is just two years younger than he and to whom he opined looks up to him and mimics him. The Court further finds that the Mother has a large network of family here in Chattanooga to nurture and support [W.K.] and that it is the paramount best interest of

[W.K.] that he be returned to Chattanooga to be reunited with his Mother and sister and the extended family. There is proof in the record that [W.K.] would be considered for placement at his sister's school, Boyd Buchanan, which the Court finds is an excellent placement for [W.K.].

## C.

Mr. Kelly appealed from the trial court's order. A majority of the Court of Appeals found that "several facts weigh against the Trial Court's best interest finding," and reversed the trial court's decision to assign Ms. Kelly as W.K.'s primary residential parent. *Kelly v. Kelly*, 2013 WL 4007832, at *6.

The Court of Appeals found that "insofar as the Trial Court relied on the testimony of the counselor . . . and it is clear that the Trial Court did so," this reliance was error. The appellate court decided that because the guidance counselor testified by telephone rather than in person, the trial court could not "view" her testimony, "thus reducing its ability to weigh her credibility as a witness." The majority thus decided they were "free to make [their] own credibility determination" regarding the counselor. The majority then said they found "several weaknesses" in her testimony, but listed only two. First, the majority noted that the counselor "did not even know that [W.K.] was involved in Young Life, a Christian youth organization." Second, "[p]erhaps most undermining of all to her credibility," the counselor "admitted that she was 'a proponent' of children going with their mothers, thus exhibiting a clear bias in the matter." *Kelly v. Kelly*, 2013 WL 4007832, at *7.

Against these "weaknesses" in the counselor's testimony, the Court of Appeals majority emphasized W.K.'s "unequivocal testimony that he wishes to remain in Nashville," and the "considerable evidence presented concerning [W.K.]'s positive bond and relationship with his father." The majority also opined that remaining with his father would give W.K. "some stability following years of movement and the turbulence created by his parents' marital discord." *Kelly v. Kelly*, 2013 WL 4007832, at *7. The appellate court majority was also "puzzled" by the trial court's statement that the father "swept in" to keep W.K. in Richmond. To the majority, the fact that the father took W.K. against the mother's wishes showed that the father was not "indifferent to keeping [W.K.]." *Kelly v. Kelly*, 2013 WL 4007832, at *7. The Court of Appeals majority concluded that "the evidence clearly preponderates against the Trial Court's best interest finding," and instructed the trial court to enter a new parenting plan, with the father as primary residential parent. *Kelly v. Kelly*, 2013 WL 4007832, at *7.

Presiding Judge Susano wrote separately to express his "very strong disagreement" with the majority's custody ruling. "I find nothing," he said, "in the majority opinion reflecting that the trial court abused its discretion." *Kelly v. Kelly*, 2013 WL 4007832, at *13 (Susano, P.J., concurring in part and dissenting in part). Judge Susano believed that W.K.'s preference to stay with his father was "not, under the circumstances of this case, very meaningful." A young man of W.K.'s age, Judge Susano opined, "could be expected to side with a father who does not seem to discipline when appropriate, is frequently away from the home in connection with his employment, and apparently does not fully understand his son's history of bad grades and inappropriate conduct." *Kelly v. Kelly*, 2013 WL 4007832, at *17 (Susano, P.J., concurring in part and dissenting in part). Regarding the trial court's comment about Mr. Kelly "swooping in" to keep W.K., Judge Susano reframed the quote and considered it an appropriate criticism: Mr. Kelly "stepped in and prevented these siblings from being parented in the same residence." "Even assuming the validity" of the majority's three points, Judge Susano did not believe that they alone justified a finding that the evidence preponderates against the trial court's custody determination. "In the final analysis," he said "the trial court's decision effects a reuniting of siblings, who are undisputably close, in the household of their primary caregiver for most of their lives – a mother against whom, and with respect to whose parenting skills, nary a negative word can be found in the record." *Kelly v. Kelly*, 2013 WL 4007832, at *17 (Susano, P.J., concurring in part and dissenting in part).

Neither party has taken issue with the appellate court's decision regarding alimony or the award of attorneys' fees. We therefore leave those sections of the opinion of the Court of Appeals undisturbed. *See Kelly v. Kelly*, 2013 WL 4007832, at *9-13.

## II.

We begin with the standard of review. In a non-jury case such as this one, appellate courts review the trial court's factual findings de novo upon the record, accompanied by a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d); *Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013). We review the trial court's resolution of questions of law de novo, with no presumption of correctness. *Armbrister v. Armbrister*, 414 S.W.3d at 692.

Because decisions regarding parenting arrangements are factually driven and require careful consideration of numerous factors, trial judges, who have the opportunity to observe the witnesses and make credibility determinations, are better positioned to evaluate the facts than appellate judges. *Armbrister v. Armbrister*, 414 S.W.3d at 693. Determining the details of parenting plans is "peculiarly within the broad discretion of the trial judge." *Armbrister v. Armbrister*, 414 S.W.3d at 693 (quoting *Edwards v. Edwards*, 501 S.W.2d 283, 291 (Tenn.

Ct. App. 1973)). "It is not the function of appellate courts to tweak a [residential parenting schedule] in the hopes of achieving a more reasonable result than the trial court." *Armbrister v. Armbrister*, 414 S.W.3d at 693 (quoting *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001)).

A trial court's decision regarding the details of a residential parenting schedule should not be reversed absent an abuse of discretion. *Armbrister v. Armbrister*, 414 S.W.3d at 693 (citing *Eldridge v. Eldridge*, 42 S.W.3d at 88). A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party. *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008) (citing *Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008)). A trial court abuses its discretion in establishing a residential parenting schedule "only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Armbrister v. Armbrister*, 414 S.W.3d at 693 (quoting *Eldridge v. Eldridge*, 42 S.W.3d at 88).

### III.

Before we review the substance of the trial court's custody determination, we will address the decision of the Court of Appeals majority that the testimony of W.K.'s school guidance counselor was not credible. This case presents an issue of first impression regarding the proper standard of review of a trial court's decision regarding the credibility and weight that should be given to a witness who testifies by telephone. Determining the proper standard of review for testimony offered by telephone is a pure question of law. We grant no deference to the Court of Appeals' decision on this issue.

When it comes to live, in-court witnesses, appellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are "uniquely positioned to observe the demeanor and conduct of witnesses." *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000). "[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999); *see also Hughes v. Metro. Gov't of Nashville & Davidson Cnty.*, 340 S.W.3d 352, 360 (Tenn. 2011). In order for evidence to be clear and convincing, it must eliminate any "serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *State v. Sexton*, 368 S.W.3d 371, 404 (Tenn. 2012) (quoting *Grindstaff v. State*, 297 S.W.3d 208, 221 (Tenn. 2009)). Whether the evidence is clear and convincing is a question of law that appellate courts review de novo without a presumption of correctness.

*Reid ex rel. Martiniano v. State*, 396 S.W.3d 478, 515 (Tenn. 2013), (citing *In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010)), *cert. denied*, 134 S. Ct. 224 (2013).

On the other hand, appellate courts are not required to give similar deference to a trial court's findings of fact based on documentary evidence such as depositions, transcripts, or video recordings. *Mitchell v. Fayetteville Pub. Utils.*, 368 S.W.3d 447, 448 (Tenn. 2012); *Orrick v. Bestway Trucking, Inc.*, 184 S.W.3d 211, 216 (Tenn. 2006); *State v. Binette*, 33 S.W.3d at 217. When findings are based on documentary evidence, an appellate court's ability to assess credibility and to weigh the evidence is the same as the trial court's. *Landers v. Fireman's Fund Ins. Co.*, 774 S.W.2d 355 (Tenn. 1989). Accordingly, when factual findings are based on documentary evidence, an appellate court may draw its own conclusions with regard to the weight and credibility to be afforded that documentary evidence. *Excel Polymers, LLC v. Broyles*, 302 S.W.3d 268, 271 (Tenn. 2009); *Bohanan v. City of Knoxville*, 136 S.W.3d 621, 624 (Tenn. 2004) (quoting *Krick v. City of Lawrenceburg*, 945 S.W.2d 709, 712 (Tenn. 1997)).

The first witness at the July 12, 2012 hearing was a guidance counselor from Brentwood High School. The guidance counselor described W.K.'s grades, his behavior at school, and his friends. She also at one point stated that she was "a proponent of kids being with their mom and their siblings." Our review of the counselor's testimony is complicated by the fact that she testified by telephone.

Tennessee law permits testimony by telephone in only a handful of narrowly drawn circumstances.[1] Testimony in civil cases is generally governed by Tenn. R. Civ. P. 43.01, which states:

> In all actions at law or equity, the testimony of witnesses shall be taken pursuant to the Tennessee Rules of Evidence. Also, for good cause shown in compelling circumstances and with appropriate safeguards, the court may permit presentation of testimony in open court by contemporaneous audio-visual transmission from a different location.

[1] *See, e.g.*, Tenn. Code Ann. § 24-7-121(d) (2000) (permitting telephonic testimony regarding payment records in child support cases); Tenn. Code Ann. § 34-8-106(b) (Supp. 2013) (permitting witnesses located in other states to testify by telephone in conservatorship or guardianship proceedings); Tenn. Code Ann. § 36-1-113(f)(3) (2010 & Supp. 2013) (permitting an incarcerated parent or guardian to participate by telephone in a hearing to terminate parental rights); Tenn. Code Ann. § 36-5-2316(f) (2010) (permitting a witness located in another state to testify by telephone in cases under the Uniform Interstate Family Support Act); Tenn. Code Ann. § 36-6-214(b) (2010) (permitting a witness located in another state to testify by telephone in cases under the Uniform Child Custody Jurisdiction and Enforcement Act).

In addition to live testimony, this rule contemplates the use of contemporaneous audio-visual (but not audio only) transmissions. And even then, good cause, compelling circumstances, and adequate safeguards must be established before testimony by video conferencing may be allowed. *See* Tenn. R. Civ. P. 43.01 Advisory Comm. Cmt. The parties have pointed to no Tennessee law or rule that would permit testimony by telephone in cases such as this one.

There are important reasons why live, in-person testimony is more desirable than remote testimony. One frequently cited list explains that a witness's personal appearance in court (1) assists the trier of fact in evaluating the witness's credibility by allowing his or her demeanor to be observed first-hand; (2) helps establish the identity of the witness; (3) impresses upon the witness the seriousness of the occasion; (4) assures that the witness is not being coached or influenced during testimony; (5) assures that the witness is not referring to documents improperly; and (6) in cases where required, provides for the right of confrontation of witnesses. *Bonamarte v. Bonamarte*, 866 P.2d 1132, 1134 (Mont. 1994); *see also* Michael J. Webber, *Permissibility of Testimony by Telephone in State Trial*, 85 A.L.R.4th 476 (1991).

However, neither party objected to the fact that the counselor was testifying by telephone. We will, therefore, address this issue of first impression and determine the scope of review that appellate courts should employ when reviewing testimony provided by telephone.[2]

The Court of Appeals was split on this issue. The majority decided it could review the counselor's credibility de novo, as if she had testified by deposition. Because the trial court "lacked the ability to view" the counselor testifying, the majority believed this reduced the trial court's "ability to weigh her credibility as a witness." The majority therefore felt "free to make [their] own credibility determination." Because the counselor had gaps in her knowledge of W.K.'s social life, and because she was "a proponent" of children remaining with their mothers and siblings, the majority determined she had "a clear bias" that undermined her credibility. *Kelly v. Kelly*, 2013 WL 4007832, at *7.

Presiding Judge Susano took issue with this lack of deference. The trial court, he said, "had the advantage of *hearing* the witness. What was the tone of her voice? What about the

_____

[2]We note that the parties could have deposed the guidance counselor and could even have deposed her by telephone. Tenn. R. Civ. P. 32.01(3) authorizes courts to receive testimony by deposition when the witness is "unavailable" as defined by Tenn. R. Evid. 804(a). Tenn. R. Evid. 804(a)(6), in turn, provides that a witness in a civil action is unavailable when the witness is more than one hundred miles from the place of trial. Here, the guidance counselor in Brentwood was more than one hundred miles from Chattanooga, the place of trial. Additionally, Tenn. R. Civ. P. 30.02(7) provides that, by stipulation of the parties or by court order, a deposition may be taken by telephone.

inflection in her voice? Did she sound calm and sure or was she argumentative in her approach? Did she sound as if she was unbiased or did she sound like an advocate?" The "main portion" of the counselor's testimony "was about bad grades and egregious conduct at school," about which there was little dispute. Judge Susano also thought the counselor's "bias" toward keeping children with their mothers was a common bias that did not necessarily render her an untruthful witness. *Kelly v. Kelly*, 2013 WL 4007832, at *17 (Susano, P.J., concurring in part and dissenting in part).

We agree with Ms. Kelly that telephonic testimony is more akin to live testimony than to documentary evidence. As Ms. Kelly argued in her brief:

> Only the Trial Court heard the tone and inflection of [the counselor's] voice. The Trial Court was in the best position to determine whether [the counselor] sounded calm or agitated, at-ease or nervous, self-assured or hesitant, steady or stammering, confident or defensive, forthcoming or deceitful, reasonable or argumentative, honest or biased. [The counselor] was a virtual live witness – linked by wire in open court – responding in her own voice in real time to questions on direct and on cross examination. [She] was not a cold transcript for the Court of Appeals to assess anew.

While we agree with Mr. Kelly that "telephonic testimony inhibits a trial court's ability to gauge witness credibility," we also believe that a trial court is better-situated to gauge the credibility of a telephonic witness than an appellate court. To the extent that the Court of Appeals majority rejected the weight the trial court ascribed to the counselor's testimony solely because she testified by telephone, we find this lack of deference erroneous.

Applying de novo review to the counselor's testimony, the Court of Appeals majority found "several weaknesses" in the testimony's substance. Specifically, the testimony that was "most undermining of all to her credibility" was her self-description as a "proponent" of children "going with their mothers," a position that exhibited a "clear bias in the matter." *Kelly v. Kelly*, 2013 WL 4007832, at *7.

Tennessee law no longer recognizes the "tender years doctrine" – a presumption that mothers in general are better suited to be primary residential parents than fathers. Tenn. Code Ann. § 36-6-101(d) (2010) ("It is the legislative intent that the gender of the party seeking custody shall not give rise to a presumption of parental fitness or cause a presumption or constitute a factor in favor or against the award of custody to such party."); *see also In re Zaylen R.*, No. M2003-00367-COA-R3-JV, 2005 WL 2384703, at *4 (Tenn.

Ct. App. Sept. 27, 2005) (noting that Tennessee courts have "devalued" the "tender years" doctrine since 1983) (No Tenn. R. App. P. 11 application filed); *Joiner v. Griffith*, No. M2003-00536-COA-R3-JV, 2004 WL 1334519, at *2 n.6 (Tenn. Ct. App. June 14, 2004) (describing the "tender years" doctrine as "abolished"), *perm. app. denied* (Tenn. 2004); *Bah v. Bah*, 668 S.W.2d 663, 666 (Tenn. Ct. App. 1983) (adopting a "comparative fitness" approach to child custody), *perm. app. denied* (Tenn. 1984). Had the trial court applied a presumption in favor of maternal custody, this would be a legal error and an abuse of discretion.

However, there is nothing in the record to suggest that the trial court's decision is based on the tender years doctrine. The trial court made no mention of the counselor's problematic statement in its written order or from the bench. While the trial court may have relied on the counselor's testimony concerning W.K.'s grades and his behavior and social life at school, this testimony was largely uncontested, and the key facts were confirmed by other witnesses and documentary evidence. We also fail to see how the counselor's opinion on maternal custody undermined her credibility concerning W.K.'s life at school. Affording the trial court the appropriate "considerable deference" in the weight it ascribes to witness testimony, we cannot conclude that clear and convincing evidence preponderates against any decision by the trial court to rely on the counselor's testimony concerning W.K.'s life and performance in school. To the extent that the trial court found the guidance counselor to be a helpful and reliable witness, we leave that credibility determination undisturbed.

## IV.

We now turn to the law that governs the trial court's assignment of primary residential parent. At the time of a divorce, or in any other Tennessee proceeding "where the custody of a minor child or minor children is a question,"[3] the trial court must "make a custody determination," Tenn. Code Ann. § 36–6–106(a) (Supp. 2013). In *Armbrister v. Armbrister*, 414 S.W.3d 685, 693 (Tenn. 2013), we noted that the statutory requirements governing that determination are derived "from a number of separate Code sections, which are not a model of clarity." In its most recent legislative session, the General Assembly acted to alleviate the tension and complexity inherent in the Code as it existed.[4] Because these statutory revisions did not take effect until July 1, 2014, we will apply the statutes in effect when the divorce was granted in July 2012.

---

[3]Tenn. Code Ann. § 36-6-101(a)(1).

[4]The General Assembly extensively revised the statutes governing custody determinations. *See* Act of April 4, 2014, ch. 617, 2014 Tenn. Pub. Acts ___. The new factors to be considered are codified at Tenn. Code Ann. § 36-6-106 (Supp. 2014).

The overarching "standard by which courts determine and allocate the parties' parental responsibilities" after divorce is the "best interests of the child." Tenn. Code Ann. § 36-6-401(a) (2010); *see also* Tenn. Code Ann. § 36-6-106(a) (stating that custody determinations "shall be made on the basis of the best interest of the child"); *Luke v. Luke*, 651 S.W.2d 219, 221 (Tenn. 1983) (observing that "the welfare of the child has always been the paramount consideration" for determining child custody and visitation); *Holloway v. Bradley*, 190 Tenn. 565, 571, 230 S.W.2d 1003, 1006 (1950) ("The supreme rule to which all others should yield is the welfare and best interest of the child."). When addressing these issues, the courts were required to consider the ten factors enumerated in Tenn. Code Ann. § 36-6-106(a)(1)-(10). They were also required to take into account "the location of the residences of the parents, the child's need for stability and all other relevant factors." Tenn. Code Ann. § 36-6-106(a).

## V.

We find no evidence in this record that the trial court abused its discretion in designating Ms. Kelly as W.K.'s primary residential parent. In making its decision, the trial court explicitly relied on Tenn. Code Ann. § 36-6-106. The trial court found six of the ten Tenn. Code Ann. § 36-6-106(a) factors to be relevant. The court specifically acknowledged W.K.'s preference in accordance with factor Tenn. Code Ann. § 36-6-106(a)(7). The court, however, found that the factor at Tenn. Code Ann. § 36-6-106(a)(10) (each parent's past and potential future performance of parental responsibilities) outweighed the child's own preference. The court essentially found that Ms. Kelly was better suited to parent W.K. and that keeping the siblings together would be better than having them live apart. The court listed facts that supported these determinations and made clear that the overriding standard was in the best interests of W.K.

In light of the trial court's clearly articulated findings, we find no evidence that the court applied an incorrect legal standard, reached an illogical conclusion, or based its decision on a clearly erroneous assessment of the evidence. Appellate courts should reverse custody decisions "only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence." *Armbrister v. Armbrister*, 414 S.W.3d at 693 (quoting *Eldridge v. Eldridge*, 42 S.W.3d at 88). The trial court applied the proper legal standards. Its custody ruling falls well within the spectrum of possible reasonable results. Granting the trial court the deference it deserves in ascribing credibility and weight to the witnesses' testimony, we find no basis to overturn the trial court's assignment of Ms. Kelly as W.K.'s primary residential parent.

-13-

## VI.

Although Tennessee law does not expressly provide for live trial testimony via telephone, we have determined that when such testimony occurs, it should be reviewed on appeal using the same deferential standard as live in-person testimony. Therefore, we find that the Court of Appeals erred by independently weighing the guidance counselor's testimony by telephone. Having found no abuse of discretion in the trial court's decision to assign Ms. Kelly as W.K.'s primary residential parent, we reverse the portion of the Court of Appeals's opinion concerning custody. We assess the costs of this appeal to Willard Reed Kelly for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., JUSTICE