FILED

11/19/2018

Clerk of the
Appellate Courts

# IN THE COURT OF APPEALS OF TENNESSEE
# AT NASHVILLE
### Assigned on Briefs August 1, 2018

## IN RE E.W.N.[1]

### Appeal from the Circuit Court for Lincoln County
### No. 16CV-127    Franklin L. Russell, Judge

_____

### No. M2017-02463-COA-R3-JV

_____

This case involves a custody dispute between M.J.L. and J.L. (paternal grandparents) and B.G. and M.N. (maternal grandparents) with respect to their grandchild, E.W.N.[1] Paternal grandparents initiated a dependency and neglect action in juvenile court. The juvenile court adjudicated the child dependent and neglected and awarded full custody to paternal grandparents. Soon thereafter, maternal grandparents filed a petition to intervene, seeking custody or joint custody of the child. The juvenile court entered a final order that granted all grandparents joint legal custody of the child. The court's order further provided that during the school year paternal grandparents would have primary physical custody and that during the summer maternal grandparents would have primary physical custody. Both sets of grandparents were also awarded visitation. Maternal grandparents appealed the decision of the juvenile court to the circuit court. After a hearing, the circuit court ordered a custody arrangement essentially identical to the one ordered by the juvenile court. Maternal grandparents appeal. We affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
### Affirmed; Case Remanded

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which RICHARD H. DINKINS and KENNY W. ARMSTRONG, JJ., joined.

Amanda Raye Thornton, Nashville, Tennessee, for the appellants, B.G. and M.N.

Stephen W. Pate, Murfreesboro, Tennessee, for the appellees, M.J.L. and J.L.

_____

[1] M.J.L. is the child's paternal grandfather; his wife, J.L. is the child's step-grandmother. Out of convenience, we refer to both M.J.L. and J.L. as paternal grandparents. Also, maternal grandparents, B.G. and M.N., were never married to each other and do not live together. In fact, during the course of this litigation, B.G. was married to another man.

**OPINION**

**I.**

E.W.N. was born on September 23, 2015, to C.L.N. (mother) and J.S.L. (father). The parents of the child were never married. They lived with maternal grandfather during mother's pregnancy; however, father was eventually kicked out of the house due to concerns about father's mental abuse of mother. Mother and the child continued to reside with maternal grandfather after the child was born.

On February 16, 2016, mother, only twenty-one years old, tragically passed away due to congenital heart failure. A few days after mother's death, father filed a petition in the juvenile court seeking full legal and physical custody of the child; he also sought to have the child's name changed to E.W.L. The court entered an order granting father his requested relief.

On April 22, 2016, paternal grandparents filed a petition in the juvenile court seeking to have the child adjudicated dependent and neglected due to concerns about father's alleged drug abuse. On the same day, the juvenile court entered a protective custody order that granted paternal grandparents temporary legal and physical custody of the child. The court also announced that a hearing would be held on April 27, 2016, to determine if the protective custody order should remain in effect. Father was properly served but failed to appear at the hearing. After the hearing, the juvenile court entered an order adjudicating the child to be dependent and neglected and placing the child in the care, custody, and control of paternal grandparents.

On May 10, 2016, maternal grandparents filed a petition to intervene, seeking full custody or joint custody of the child. After a hearing on October 25, 2016, the juvenile court entered a final order that granted all grandparents joint legal custody of the child, meaning that all major decisions relating to the child would have to be made jointly. The order further provided that during the school year paternal grandparents would have primary physical custody of the child and that maternal grandparents would have visitation forty-eight hours per week.[2] Unless otherwise agreed to by the parties, visitation would occur from Wednesday at 4:00 p.m. until Friday at 4:00 p.m. Once the child started school, visitation would be every other weekend. During the summer months, the residential schedule was flipped so that maternal grandparents would have primary physical custody. The same visitation rules applied, but paternal grandparents were also awarded one week of vacation with the child. The court's order also provided for a right of first refusal, such that if any party was unable to parent the child during

---

[2] The juvenile court granted maternal grandparents one block of parenting time despite the fact that they are not married and do not live together. Maternal grandparents testified that they have developed a schedule that allows each of them to see the child during their allotted parenting time.

- 2 -

their scheduled parenting time, that party would have to offer the other grandparents the option of babysitting before seeking a third-party babysitter or daycare provider.

Maternal grandparents appealed the decision of the juvenile court to the circuit court. After hearing the case de novo, the circuit court determined that the residential schedule ordered by the juvenile court was in the best interest of the child. Accordingly, the circuit court ordered that the residential schedule would remain in effect.[3] Maternal grandparents appeal.

## II.

Maternal grandparents raise a host of issues that can be consolidated into one: whether the trial court abused its discretion in formulating the present custody arrangement.

## III.

In *Kelly v. Kelly*, the Supreme Court summarized our standard of review in child custody cases:

> In a non-jury case such as this one, appellate courts review the trial court's factual findings de novo upon the record, accompanied by a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d); *Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013). We review the trial court's resolution of questions of law de novo, with no presumption of correctness. *Armbrister v. Armbrister*, 414 S.W.3d at 692.
>
> Because decisions regarding parenting arrangements are factually driven and require careful consideration of numerous factors, trial judges, who have the opportunity to observe the witnesses and make credibility determinations, are better positioned to evaluate the facts than appellate judges. *Armbrister v. Armbrister*, 414 S.W.3d at 693. Determining the details of parenting plans is "peculiarly within the broad discretion of the trial judge." *Armbrister v. Armbrister*, 414 S.W.3d at 693 (quoting *Edwards v. Edwards*, 501 S.W.2d 283, 291 (Tenn. Ct. App. 1973)). "It is

---

[3] The trial court also made slight modifications to other parts of the custody arrangement that are not relevant to this appeal.

not the function of appellate courts to tweak a [residential parenting schedule] in the hopes of achieving a more reasonable result than the trial court." ***Armbrister v. Armbrister***, 414 S.W.3d at 693 (quoting ***Eldridge v. Eldridge***, 42 S.W.3d 82, 88 (Tenn. 2001)).

A trial court's decision regarding the details of a residential parenting schedule should not be reversed absent an abuse of discretion. ***Armbrister v. Armbrister***, 414 S.W.3d at 693 (citing ***Eldridge v. Eldridge***, 42 S.W.3d at 88). A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party. ***State v. Banks***, 271 S.W.3d 90, 116 (Tenn. 2008) (citing ***Konvalinka v. Chattanooga–Hamilton Cnty. Hosp. Auth.***, 249 S.W.3d 346, 358 (Tenn. 2008)). A trial court abuses its discretion in establishing a residential parenting schedule "only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." ***Armbrister v. Armbrister***, 414 S.W.3d at 693 (quoting ***Eldridge v. Eldridge***, 42 S.W.3d at 88).

445 S.W.3d 685, 691-92 (Tenn. 2014).

## IV.

## A.

Pursuant to statute, all custody determinations "shall be made on the basis of the best interest of the child." Tenn. Code Ann. § 36-6-106(a) (2017). To that end, the statute instructs trial courts to "order a custody arrangement that permits both parents [or, in this case, grandparents] to enjoy the maximum participation possible in the life of the child consistent with the factors set out in this subsection (a), the location of the residences of the parents, the child's need for stability and all other relevant factors." *Id.* Subsection (a) includes the following best interest factors:

> (1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;

- 4 -

(2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;

(3) Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6) The love, affection, and emotional ties existing between each parent and the child;

(7) The emotional needs and developmental level of the child;

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. The court may order an examination of a party under Rule 35 of the Tennessee Rules of Civil Procedure and, if necessary for the conduct of the proceedings, order the disclosure of confidential mental health information of a party under § 33-3-105(3). The court order required by § 33-3-105(3) must contain a qualified protective order that limits the dissemination of confidential protected mental health information to the purpose of the litigation pending before the court and provides for the return or destruction of the

confidential protected mental health information at the conclusion of the proceedings;

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. The court shall, where appropriate, refer any issues of abuse to juvenile court for further proceedings;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(15) Any other factors deemed relevant by the court.

*Id*.

**B.**

In the trial court's second memorandum opinion, the court made detailed findings of fact and expressly applied those facts to most of the statutory best interest factors cited above. The court determined that factors (3) and (13) were inapplicable; that factors (1), (4), (11), and (12) favored both parties equally; and that factors (2), (7), (8), (9), (10), and (14) favored paternal grandparents. The court did not analyze factors (5) or (6). Maternal grandparents do not dispute the court's findings with respect to factors (1), (3), (4), (12), and (13). However, maternal grandparents argue that factors (2), (6), (7), (8),

- 6 -

and (9) favor both parties equally and that factors (5), (10), (11), and (14) favor maternal grandparents. We will limit our analysis to those factors actually disputed by the parties.

**1.**

Best interest factor (2) relates to "each parent's or caregiver's past and future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents . . . ." Tenn. Code Ann. § 36-6-106(a)(2). In 2012, the General Assembly amended this portion of the statute by adding the following language:

> In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order.

Tenn. Code Ann. § 36-6-106(a)(2).

Here, the trial court acknowledged that "[n]o grandparent has a history of disobeying court orders." However, the court determined that paternal grandparents "have far more" willingness and ability to facilitate and encourage a close and continuing relationship between the child and the other grandparents. The court did not state which facts it relied upon to arrive at this conclusion, but elsewhere the court made the following findings:

> On the stand, [maternal grandmother] was by far the most emotional of the grandparents. Reading the transcript of the hearing does not fully convey the grief and anger that her demeanor at trial revealed. The anger cannot focus on the dead family members so it seems to have been transferred to the paternal grandfather and his wife. Both of the maternal grandparents harbor a belief about the sinister motivations and unscrupulous maneuvering of the [paternal grandparents] that simply is not born out by the facts proven at the trial.

The court also expressed concern about various statements that maternal grandmother made at trial, on social media, and via text message that illustrated her anger at paternal grandparents. On one occasion, maternal grandmother asked for additional

visitation time so that she could take the child to mother's grave on her birthday. When paternal grandparents refused, maternal grandmother sent a text message that said, "Wait until I have custody." Maternal grandmother also accused paternal grandparents of taking the child's Social Security benefits without any evidence to support her assertion. Because maternal grandmother's testimony and text messages speak for themselves, the evidence preponderates in favor of the facts as found by the trial court. We must also respect the trial court's observations about maternal grandmother's demeanor in the courtroom, which apparently caused the court great concern. *See Kelly v. Kelly*, 445 S.W.3d 685, 691-92 (Tenn. 2014) ("[T]rial judges, who have the opportunity to observe the witnesses and make credibility determinations, are better positioned to evaluate the facts than appellate judges." (citing *Armbrister*, 414 S.W.3d at 693)).

With this evidence in mind, we agree with the trial court that factor (2) weighs in favor of paternal grandparents. It is true that maternal grandparents have consistently complied with court orders and have even articulated an understanding that the child needs to have a relationship with paternal grandparents. However, we must be mindful of the trial court's observation that "[r]eading the transcript of the hearing does not fully convey the grief and anger that [maternal grandmother's] demeanor at trial revealed." If maternal grandmother harbors intense anger at paternal grandparents, it is likely that she will not encourage the child to have a good relationship with them. Maternal grandmother also sent at least one text message that can be interpreted as a threat to interfere with, or at least limit, paternal grandparents' visitation with the child. Such behavior is relevant to an analysis of factor (2). *Compare Brown v. Brown*, No. E2017-01348-COA-R3-CV, 2018 WL 4182292, at *7 (Tenn. Ct. App., filed Aug. 30, 2018) (discounting text messages that contained mere name-calling) *with Nunnally v. Nunnally*, No. E2016–01414–COA–R3–CV, 2017 WL 1536084, at *2 (Tenn. Ct. App., filed Apr. 28, 2017) (considering a text message in which mother threatened to keep a child away from father).

Finally, there is evidence in the record that paternal grandparents allowed maternal grandparents to have additional visitation than what was required by the juvenile court's order. For example, the parties testified that paternal grandparents allowed the child to visit maternal grandparents on Easter and Christmas in order to take family photos. Additionally, paternal grandparents allowed the child to go to maternal grandmother's wedding, which took place on a Saturday. We have held that a parent or guardian's efforts to make accommodations in a residential schedule is evidence that the parent or guardian is willing to facilitate a good relationship between the child and his other caregiver(s). *See, e.g., Brown*, 2018 WL 4182292, at *7 (listing ways in which mother was willing to facilitate and encourage the child's relationship with father by making accommodations in the court-ordered residential schedule).

Maternal grandparents point out that paternal grandparents denied two requests for additional visitation time. As previously discussed, however, paternal grandparents

denied one of those requests because they believed it was inappropriate for maternal grandmother to take the child to a cemetery at such a young age. Such a decision does not demonstrate hostility toward maternal grandparents. Furthermore, it is not necessary for a parent or guardian to grant every request for additional visitation in order to demonstrate a willingness to facilitate and encourage a relationship between the child and his other caregiver(s).

Maternal grandparents also claim that they have not similarly granted additional visitation time because paternal grandparents have never asked for it. That argument is undermined, however, by maternal grandmother's own testimony about her threatening text message. According to maternal grandmother, by texting, "Wait until I have custody," she was threatening to withhold additional visitation time that paternal grandparents were denying to her on that particular occasion.

Viewing the totality of the evidence in the record, we agree with the trial court that paternal grandparents have already demonstrated a willingness to facilitate a relationship between the child and maternal grandparents and will likely continue to do so. Maternal grandparents have acknowledged that the child needs a relationship with paternal grandparents, but maternal grandmother seems less likely to facilitate and encourage that relationship. Thus, the trial court did not err by concluding that factor (2) favors paternal grandparents.

**2.**

Best interest factor (5) directs the court to consider "the degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities." Tenn. Code Ann. § 36-6-106(a)(5). The trial court did not address this factor; however, in analyzing factor (1) the court found that neither set of grandparents "has performed the majority of parenting responsibilities relating to the daily needs of the child." Oddly, maternal grandparents did not contest the court's finding with respect to factor (1), but they argue that factor (5) weighs in their favor.

We disagree. First, we struggle to see how two individuals who are not married to one another and who do not even live in the same house can both be "the primary caregiver" of the child. Even assuming that both maternal grandparents could be primary caregivers while living separately, the evidence does not demonstrate that maternal grandparents have collectively performed more parenting responsibilities than paternal grandparents.

Although the child resided with maternal grandparents in the early months of his life, mother was presumably his primary caregiver during that time. Soon after mother died in February 2016, paternal grandparents obtained full custody of the child. They

maintained full custody from April 27, 2016, until November 2, 2016, when the juvenile court established a new custody arrangement. Since November 2016, paternal grandparents have kept the child three days and five nights per week during the school year.[4] Maternal grandparents have kept the child four days and two nights per week during the school year.[5] Accordingly, under the current custody arrangement, the grandparents spend substantially equal time parenting the child during the school year (with maternal grandparents performing slightly more responsibilities during the day and paternal grandparents performing more responsibilities in the evenings). During the summer months, when the residential schedule is flipped, maternal grandparents spend slightly more time with the child. In addition, both sets of grandparents have made efforts to care for the child's daily needs. Testimony revealed that maternal grandparents have historically acted with greater speed in scheduling certain medical appointments for the child; however, the trial court observed that paternal grandparents attended important doctor's appointments and agreed to necessary medical tests.

Based on the foregoing evidence, we conclude that neither set of grandparents "has taken the greater responsibility for performing parental responsibilities." Tenn. Code Ann. § 36-6-106(a)(5). Consequently, we hold that this factor favors both sides equally.

**3.**

Best interest factor (6) concerns "[t]he love, affection, and emotional ties existing between each parent and the child." Tenn. Code Ann. § 36-6-106(a)(6). The trial court did not address this factor. Maternal grandparents argue that this factor favors both parties equally. We agree. It is clear from the testimony that both sets of grandparents love the child and that the child has emotional ties to each of them. For instance, paternal grandparents testified that they love the child and that the child enjoys reading and playing toys with them. Maternal grandparents also testified that they love the child and that the child cries when they are separated. Neither party disputes the existence of an emotional bond between the child and the other grandparents.

---

[4] Paternal grandparents testified that they keep the child during the day on Monday, Saturday, and Sunday. They also keep the child on Monday, Tuesday, Friday, Saturday, and Sunday evenings.

[5] Although the order of the juvenile court only gave maternal grandparents visitation from Wednesday at 4:00 p.m. to Friday at 4:00 p.m., maternal grandfather exercises his right of first refusal on Tuesdays from 9:00 a.m. to 2:00 p.m. and all day on Wednesdays. Paternal grandparents are unable to care for the child during those times because paternal grandfather works nights and sleeps during the day and paternal grandmother works until 2:00 p.m. on weekdays.

**4.**

Best interest factor (7) requires the court to consider "[t]he emotional needs and developmental level of the child." Tenn. Code Ann. § 36-6-106(a)(7). The trial court found that "[t]he emotional needs of the child will probably be great when he becomes old enough to understand that his mother is deceased and that his father is or has been a serious drug abuser." The court further determined that paternal grandparents would "be somewhat better able to assist in this until the maternal grandmother makes more progress in her recovery from her understandably enormous sense of grief and anger."

We agree with maternal grandparents that the evidence in the record does not preponderate in favor of the court's factual finding that "[t]he emotional needs of the child will probably be great" as the child gets older. The child is too young to understand, let alone communicate, his emotional needs at the present time. Neither party introduced expert testimony regarding the likely extent of the child's future emotional or developmental needs. Indeed, the court's use of the word "probably" betrays the uncertain nature of the court's assertion. We therefore vacate the trial court's findings relative to this factor. We conclude that this factor favors both parties equally.

**5.**

Best interest factor (8) concerns "[t]he moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child." Tenn. Code Ann. § 36-6-106(a)(8). The trial court found that "the grandparents are equally fit at a moral and physical level, but as to mental and emotional fitness, the paternal grandfather and his wife will have an advantage until the maternal grandmother can make further progress in her grief management."

Several of the trial court's findings of fact support the court's conclusion that maternal grandmother is not equally fit at a mental and emotional level to care for the child. Maternal grandmother testified that in 2014 she lost her parents, a brother, and a stepdaughter in a car accident. Just a couple of years later, three more of her family members passed away – her twenty-one year old daughter, another brother, and a three-month-old grandchild. Maternal grandmother testified that after her losses in 2014 she was prescribed anti-anxiety medication. She stated that she was still taking the medication at the time of trial. After losing her daughter, maternal grandmother was prescribed another anti-anxiety drug for a short period of time. Maternal grandmother also sought grief counseling and admitted that she has consulted two psychics.

Maternal grandparents correctly observe that a person's "emotional fitness" is only relevant to the factor (8) analysis in so far as "it relates to [the person's] ability to parent the child." Tenn. Code Ann. § 36-6-106(a)(8); *see also* **Burden v. Burden**, 250 S.W.3d 899, 911 (Tenn. Ct. App. 2007) (stating that a father's mental illness would not be

relevant if it "did not impact [c]hild in a harmful way"). However, the trial court clearly believed that maternal grandmother's emotional state was affecting her parenting abilities. The court repeatedly emphasized the grief and anger that maternal grandmother displayed at trial. The court also pointed to statements made by maternal grandmother, such as, "After my daughter passed away, I lost my identity," and "I won't stop until I get what my daughter wants." Finally, the trial court discussed an incident in which maternal grandmother got into a dispute with paternal grandparents about whether she could take the infant child to visit mother's grave. Those statements and actions led the trial court to conclude that maternal grandmother needed further grief counseling so that she could learn to "lov[e] the child as himself and not as a proxy for his deceased mother."

The trial court acted within its authority in making that determination. Contrary to maternal grandparents' assertion, the court did not need to "diagnose mental health issues," because maternal grandmother admitted to experiencing anxiety and depression and taking anti-anxiety medication. The court also demonstrated how maternal grandmother's mental health issues affected her parenting ability. That evidence leads us to agree with the trial court that factor (8) weighs in favor of paternal grandparents.

**6.**

Best interest factor (9) requires the court to consider "[t]he child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities." Tenn. Code Ann. § 36-6-106(a)(9). The trial court determined that this factor weighed in favor of paternal grandparents because spending more time in one household would provide more opportunities for the child to develop relationships and form a connection with his physical surrounding. The court noted, however, that this was not a decisive factor due to the child's age.

We agree with the trial court that this is not a decisive factor. The child does not have any siblings – biological or otherwise. There was little testimony regarding the child's other relatives. At least two family members (his father and a maternal aunt) are allegedly addicted to methamphetamine and are prohibited from contacting the child under the current custody arrangement. On balance, we agree with the trial court that this factor favors paternal grandparents slightly more than maternal grandparents. Being in one home for the majority of the time rather than two homes will enable the child to form a stronger connection to his physical surroundings and the family members that he does encounter.

**7.**

Best interest factor (10) demands consideration of "[t]he importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory

environment." Tenn. Code Ann. § 36-6-106(a)(10). The trial court found that maintaining the juvenile court's custody arrangement was the surest means of maintaining continuity. We agree. Paternal grandparents had full custody of the child from April 27, 2016, to November 2, 2016. Thereafter, they continued to have primary physical custody of the child during the school year.

Maternal grandparents argue that because paternal grandparents have permitted maternal grandfather to care for the child on Tuesdays and Wednesdays (in addition to his visitation time) that continuity is best achieved by giving maternal grandparents primary physical custody. For reasons discussed in Part IV.B.9 of this opinion, we are not persuaded that altering the current custody arrangement would provide more continuity in the child's life. Moreover, if we accepted maternal grandparents' argument, such a holding might discourage families from allowing children to spend additional time with other family members out of fear of losing primary physical custody.

**8.**

Best interest factor (11) requires the court to take into account "[e]vidence of physical or emotional abuse to the child, to the other parent or to any other person. . . ." Tenn. Code Ann. § 36-6-106(a)(11). At trial, there was extensive testimony regarding allegations of abuse. Both sets of grandparents accused one another of engaging in unsafe activities with the child. For example, a photograph entered into evidence showed paternal grandfather holding the infant child on top of a horse. Paternal grandfather testified, however, that he was holding the child with both hands, the horse was not moving, and the child was there "for just a couple of seconds." Another photograph entered into evidence showed the child on a four-wheeler with his maternal uncle. Maternal grandmother testified that she was not present and that she would not have allowed the uncle to place the child on the four-wheeler. The grandparents also accused one another of failing to prevent diaper rashes and bug bites and exposing the child to things that exacerbate his allergies. The trial court quite appropriately found these allegations "profoundly unpersuasive of abuse by any grandparent of the child."

Other allegations were more serious. D.G., the twenty-seven year old daughter of paternal grandparents, lives in Texas and flew to Tennessee to testify that paternal grandparents were abusive to her and her siblings during their childhood.[6] D.G. testified that she grew up in a "dirty" home with no heat. She recalled being left alone "often" as a six-year-old child. D.G. testified that she was "hit" by both parents. She described paternal grandmother as "very manipulative" and a "slapper." According to D.G., when she was twelve-years-old paternal grandmother prohibited her from shaving her legs. When D.G. disobeyed, D.G. said that paternal grandmother beat her with a belt.

---

[6] J.L. is the biological mother of D.G.; M.J.L. is her stepfather.

- 13 -

D.G. testified that paternal grandfather was "very temperamental" and that he has a "flash temper . . . that comes on in an instant and it is violent." D.G. testified that when she was fifteen-years-old paternal grandfather punched her in the face with a closed fist. D.G. also described an incident in which paternal grandfather punched her older brother, J.G., in the face after J.G. had physically assaulted D.G. D.G. claimed that she reported at least some acts of alleged abuse to a high school counselor; however, she admitted that the Department of Children's Services was never contacted.

D.G. testified that she moved to Texas to live with her biological father when she was sixteen-years-old. She admitted that she had only been in the home of paternal grandparents one time since she moved out. She also testified that she has only seen paternal grandparents "maybe three" times between the ages of nineteen and twenty-seven. One of those occasions was her wedding in Texas. D.G. testified that paternal grandparents attended the wedding, helped set up the ceremony, took photographs with D.G., and also stayed in D.G.'s home. D.G. testified that after the wedding she reestablished a relationship with paternal grandmother and began texting her "pretty regularly." D.G. also came back to Tennessee to attend mother's funeral. D.G. stated that after the funeral she went to a restaurant with paternal grandparents.

Paternal grandfather admitted that he had gotten into a "confrontation" with D.G. on one occasion. He stated that D.G. had been "mouthing her mom" and that he intended to slap, not punch, her. He denied using a closed fist. Paternal grandfather was never asked whether he ever punched J.G.; however, paternal grandfather did admit to hitting father with a tobacco stick about ten years ago. Paternal grandfather testified that he was arrested as a result of that incident and that a restraining order was entered against him; however, charges were retired upon his completion of anger management classes. Paternal grandfather testified that he does not have an anger issue. Both paternal grandparents testified that they do not hit or spank E.W.N.

Maternal grandparents testified that they were not aware of any physical abuse committed by paternal grandparents against E.W.N.[7] However, maternal grandmother did testify that she saw paternal grandmother slap father. Maternal grandmother also testified that paternal grandmother told her that paternal grandfather had once thrown his cell phone to the ground in anger. Paternal grandparents denied both allegations.

The trial court found that "[t]he evidence concerning the paternal grandparents' abuse of other children and of his wife was unpersuasive and dealt with incidents remote in time." The court specifically found that the testimony of D.G. lacked credibility. The

---

[7] Maternal grandmother testified that when the child gets angry, he sometimes slaps himself in the face. Maternal grandmother implied that paternal grandparents might be responsible for that behavior, but she offered no evidence to support that theory and admitted "that could be a child thing."

court emphasized that D.G., by her own admission, had only been in paternal grandparents' home one time in the last eleven years. The court also observed that D.G.'s testimony about her poor relationship with paternal grandparents seemed "inconsistent" with her more recent interactions with them. Specifically, the court noted that D.G. seemed to get along with paternal grandparents when they attended her wedding and when D.G. attended mother's funeral. D.G. and paternal grandmother had also reestablished a relationship and communicated regularly.

Maternal grandparents argue that factor (11) should weigh in their favor. They argue that the trial court should have found D.G.'s testimony to be credible because when paternal grandmother was asked whether D.G. was a truthful person, she answered, "As far as I know." Maternal grandparents also emphasize the fact that paternal grandfather admitted to having a physical altercation with D.G. and to striking father with a tobacco stick. He also admitted that he attended anger management classes as a result of the latter incident.

The trial court is in the best position to make credibility determinations. "[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." **Kelly v. Kelly**, 445 S.W.3d 685, 692 (Tenn. 2014) (quoting **Wells v. Tennessee Bd. of Regents**, 9 S.W.3d 779, 783 (Tenn. 1999)). "In order for evidence to be clear and convincing, it must eliminate any 'serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" **Id.** at 692-93 (quoting **State v. Sexton**, 368 S.W.3d 371, 404 (Tenn. 2012)).

Here, paternal grandfather's testimony does corroborate D.G.'s testimony to some extent. Paternal grandfather admits that about twelve years ago he attempted to slap D.G. for "mouthing her mom." He also admits that about ten years ago he struck father with a tobacco stick and attended anger management classes. In our view, paternal grandfather's testimony "eliminate[s] any serious or substantial doubt" that he has resorted to corporal punishment on at least two occasions. However, his testimony does not eliminate serious doubt about whether he ever punched D.G. or J.G. with a closed fist or whether he and his wife regularly engaged in abusive behavior. We also do not think that paternal grandmother's comment about D.G.'s character for truthfulness (made prior to D.G.'s testimony) amounts to an admission of the specific allegations of abuse. Recognizing that the trial court is better positioned to judge the credibility of witnesses, we disregard the testimony of D.G. except in so far as her testimony is corroborated by the testimony of paternal grandparents.

Although we are concerned about paternal grandfather's two violent outbursts, we cannot say that those incidents, which occurred ten and twelve years ago, are enough to cause factor (11) to weigh in favor of maternal grandparents. We agree with the trial court that the remoteness of those events significantly dilutes their significance. There have been no allegations of abuse in the intervening years, and maternal grandparents

testified that they are not aware of any ongoing abuse. We are also mindful that the trial court heard and saw the testimony of paternal grandparents and determined that they are not a threat to the child's safety. In light of the foregoing, we conclude that factor (11) favors both parties equally.

**9.**

Finally, best interest factor (14) relates to each parent or guardian's employment schedule. *See* Tenn. Code Ann. § 36-6-106(a)(14). The trial court found that "the employment schedules of the maternal grandparents seem to facilitate their exercise of the parenting time granted to them." Thus, the court impliedly held that factor (14) favors the custody arrangement ordered by the juvenile court, which gave paternal grandparents primary physical custody for most of the year.

As previously discussed, the parties have very different work schedules. Paternal grandparents both work Monday through Friday. Paternal grandfather testified that he works nights from 7:30 p.m. to 6:00 a.m. Paternal grandmother testified that she works days from 6:00 a.m. to 2:00 p.m. During the week, paternal grandparents hire a babysitter to watch the child from 5:15 a.m. (when paternal grandmother leaves for work) until about 6:30 a.m. (when paternal grandfather gets home from work). Paternal grandfather keeps the child during the day on Monday, but on Tuesday and Wednesday mornings he drops the child off with maternal grandfather and returns home so that he can sleep. On Tuesdays, paternal grandmother picks up the child in the afternoon after she gets off work. On Wednesdays, however, the child stays with maternal grandfather all day, because maternal grandparents' visitation block begins on Wednesday at 4:00 p.m.

Maternal grandfather testified that he works weekend nights.[8] Maternal grandmother works during the day. Under the current custody arrangement, maternal grandfather keeps the child during the day on Tuesday and Wednesday (pursuant to the right of first refusal). During maternal grandparents' visitation block, maternal grandfather keeps the child during the day on Thursday and Friday and maternal grandmother keeps the child on Wednesday and Thursday evenings.

Needless to say, the trial court faced a difficult decision in deciding how to weigh this best interest factor. Under the current custody arrangement, for most of the year the child is passed between two different households four days per week (Tuesday through Friday). If maternal grandparents were granted primary physical custody, the child would presumably be passed between two different households five days per week

---

[8] Specifically, maternal grandfather testified that he works Friday at 5:00 p.m. to Saturday at 6:30 a.m., Saturday at 6:00 p.m. to Sunday at 6:30 p.m., and Sunday at 7:00 p.m. to Monday at 8:30 a.m.

(Monday through Friday); maternal grandfather would keep the child during the day and maternal grandmother would keep the child in the evenings after work.

In the short term, it seems that none of the grandparents' work schedules are conducive to maximizing stability for the child. However, when the child begins school, paternal grandparents will not have to rely on maternal grandfather to keep the child on Tuesdays and Wednesdays; they will be able to keep the child under one roof throughout the week and every other weekend. In contrast, if maternal grandparents were awarded primary physical custody, they would have to pass the child back and forth on weeknights after the child gets out of school. It is understandable that maternal grandparents would prefer such an arrangement; it is less understandable how such constant movement would be in the best interest of the child. It is primarily for this reason that we agree with the trial court that factor (14) weighs in favor of paternal grandparents.[9]

## C.

To summarize, there is no dispute between the parties with respect to factors (1), (3), (4), (12), and (13). We conclude that factors (5), (6), (7), and (11) favor both parties equally and that factors (2), (8), (9), (10), and (14) favor paternal grandparents. The trial court faced a tremendous challenge in formulating a custody arrangement that maximized all grandparents' parenting time in a manner consistent with the statutory best interest factors. In our view, the residential schedule ultimately established by the court does not "fall[ ] outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Kelly*, 445 S.W.3d at 692 (quoting *Armbrister*, 414 S.W.3d at 693)). Therefore, we hold that the trial court did not abuse its discretion in formulating the present custody arrangement.

## V.

The judgment of the trial court is affirmed. The costs on appeal are assessed to the appellants, B.G. and M.N. The case is remanded, pursuant to applicable law, for enforcement of the trial court's judgment and for collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., JUDGE

_____

[9] At one point in the trial court's second memorandum opinion, the court stated that the parties live in two different counties. We agree with maternal grandparents that the evidence clearly preponderates against that finding. All parties testified that they live in Lincoln County. That fact, however, does not change the outcome of our analysis.